Lyman Brightman NEWMAN

v.

The UNITED STATES.

No. 49817.

United States Court of Claims.

Dec. 6, 1955.

James D. Fellers, Oklahoma City, Okl., L. Karlton Mosteller and Mosteller, Fellers, Andrews & Loving, Oklahoma City, Okl., on the briefs, for plaintiff.

Walter Kiechel, Jr., Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

WHITAKER, Judge.

The plaintiff sues to recover transportation charges allegedly due him for services performed during the period from July 8, 1944 to August 16, 1945, under

a contract for the transportation by plaintiff of aviation gasoline in tractor tank-trailer units from the Phillips Petroleum Company Refinery near Borger, Texas, to United States Army Air Corps bases at Liberal, Kansas, Pratt, Kansas, and Sears Junction, the latter located about 5 miles west of Dodge City, Kansas.

Prior to the contract, plaintiff had been engaged in the transportation of aviation gasoline, with headquarters in Plainview, Texas, but in the latter part of June 1944, he discontinued operations, parked his equipment at his headquarters, and proceeded with efforts to sell it.

Shortly thereafter he received a telephone call from Captain Edwin Phelps, the Transportation Officer for the Amarillo Air Transportation Office, whose duty it was to coordinate the activities of the refineries, the carriers, and the various airfields in the movement of gasoline from refineries to bases throughout the southwest, asking him to attend a meeting of motor carriers concerning a shortage of gasoline at the three Kansas air bases referred to above due to an accelerated training program. The rail and motor carriers engaged in hauling gasoline to these bases were not able to meet the increased demand, and the meeting was called to devise means of relieving the shortage.

The meeting, which was held in Amarillo, Texas, on July 7, 1944, was attended by plaintiff, his brother, and by representatives of some 15 or 20 other motor carriers. The following Government officials were also present: Major Lawrence B. Freeman, Chief of the Petroleum Traffic Branch of the Traffic Section at Wright-Patterson Field; Charles E. Cranmer, Liaison Officer between the Tank-Truck Division of the Office of Defense Transportation and the Army Air Corps at Dayton, Ohio; H. C. Mims, Amarillo District Supervisor for the Interstate Commerce Commission; John J. Van Pelt, Maintenance Specialist of the Office of Defense Transportation at Amarillo; Lieutenant Colonel J. L. Elliott,

Chief of Transportation for the Air Service Command at Wright-Patterson Field; Captain Phelps, and a Major Strauss.

At the outset of the meeting, it developed that plaintiff was the only truck operator present with whom the Government was willing to enter into a contract because he was the only one able to produce evidence of ownership of his equipment, and so the general meeting was recessed, and plaintiff was invited to attend a closed meeting with the Government officials named above, which he did.

After considerable discussion the parties reached an agreement by which the plaintiff was to haul the gasoline from the Phillips Refinery to the three Kansas bases at rates equivalent to rail rates. Although the exact amount of the rates was not specified, Mr. Mims, of the Interstate Commerce Commission, advised plaintiff that rates equivalent to rail rates would be approximately one cent per gallon per 100 miles.

It was also agreed that plaintiff would immediately move his equipment, maintenance facilities, and operating crews to Borger, Texas, near which the Phillips Refinery is located, and would thereafter have available at all times a minimum of 28 trucking units for the purpose of transporting gasoline when called upon to do so by the Air Corps. It was further agreed that plaintiff would be paid demurrage at the rate of $5.00 per hour for all time, in excess of one hour of free time, required to complete the loading of each unit after the Air Corps had directed plaintiff to send the unit to the Phillips Refinery, and to complete the unloading of each unit after it arrived at the point of delivery.

Immediately after the meeting of July 7, 1944, plaintiff moved all his equipment to Borger in accordance with the agreement, and on July 8, 1944, began hauling gasoline for the Air Corps.

Plaintiff sues for the difference between the amounts that have been paid him and amounts equivalent to rail rates.

Defendant insists that for the period after September 16 plaintiff is entitled to no more than the rates set out in the letter dated September 18, 1944, and signed by plaintiff's bookkeeper. We are of opinion that neither position is correct, but that plaintiff is entitled to the rates set out in the tariffs filed by him and issued by the Interstate Commerce Commission, which, it turned out, were less than rail rates.

At the meeting on July 7 it was understood that Mr. Mims and Captain Phelps would prepare and have filed for plaintiff a temporary tariff providing for the rates that had been agreed upon at the meeting, and would assist plaintiff in obtaining the permits required by him for operating over the routes involved. Accordingly, Captain Phelps and Mr. Mims prepared a temporary tariff for plaintiff, which was filed with the Interstate Commerce Commission on July 17, 1944, and issued, effective July 11, 1944. It established a rate of 1.20 cents per gallon on gasoline hauled from Phillips, Texas, to the base at Liberal, Kansas, and a rate of 1.98 cents per gallon on gasoline hauled from Phillips to the base near Dodge City, Kansas. These rates were supplied by Mr. Mims and were apparently computed on the basis of a cent per gallon per 100 miles, although there was a slight error in the highway mileage used in making the conversion.

It appears that all persons involved believed that the rates appearing in the temporary tariff were equivalent to rail rates. It was not until after plaintiff had filed this action in 1950 that he learned that the rates published in this and a subsequent tariff were less than rail rates. The parties have stipulated that the rail rates actually in effect at the time the gasoline was transported were equivalent to 1.716 cents per gallon from the refinery to Liberal, Kansas, and 2.244 cents per gallon from the refinery to Dodge City, Kansas.

On July 22, 1944, plaintiff, through his own attorney and with the assistance of Mr. Mims, filed an application with the Interstate Commerce Commission for authority to transport gasoline to the bases at Liberal and Dodge City, Kansas, and requested authority to publish a tariff providing for the same rates as were specified in the temporary tariff previously filed. On August 5, 1944, the Interstate Commerce Commission denied plaintiff's request, because the Transportation Corps of the Army Service Forces had objected to the proposed rates, but later, after the Transportation Corps had withdrawn its objections, at the request of the Air Corps, the Interstate Commerce Commission entered an order on August 23, 1944, authorizing plaintiff to publish and file with the Commission a new tariff, which was issued on September 1, 1944, effective September 5, 1944. The rates set out in this tariff were the same as those appearing in the earlier temporary tariff.

At about the same time this tariff was approved, Captain Phelps notified plaintiff that he had received complaints from the Transportation Corps that the rates charged by plaintiff and other carriers in that territory were excessive and out of line with rates charged by carriers elsewhere. Captain Phelps informed plaintiff that he would have to reduce his rates to 14 cents per running mile plus a terminal charge of $8.40 based on a load of 4,000 gallons. The plaintiff stated that he could not do so without suffering a substantial loss, and he refused to do so at that time.

At the meeting on July 7, 1944, there had been discussed the possibility of a lease of Government-owned tractor-trailer units to carriers who were hauling gasoline to the air bases. Later in the summer of 1944, Captain Phelps informed plaintiff that when the units were received, plaintiff would be permitted to rent twelve of them; but after receipt of about 60 of these units, Captain Phelps telephoned plaintiff's office in Plainview and stated to plaintiff's bookkeeper that he would have to have a letter from plaintiff agreeing to the rate of 14 cents a running mile and a terminal charge of $8.40 before the Air Corps would consider leasing any of the surplus equipment

to plaintiff. He then dictated the following letter over the telephone, and requested that it be executed either by or for plaintiff. Plaintiff's bookkeeper typed and signed the letter and mailed it to Captain Phelps on September 18, 1944. The letter reads:

"Newman Motor Co.
Plainview, Texas
September 18, 1944.
Major Edwin F. Phelps,
*Transportation Officer,*
*Army Air Force, Transportation*
*Office,*
*Amarillo, Texas.*

"Dear Sir: This is to advise we have started transporting gasoline from Borger, Texas to Liberal and Dodge City Army Air Bases on the 14 cents per mile plus $8.40 rate based on load of 4000 gallons. We have instructed our attorney to file new Tariffs, which will be done immediately.

"This new rate as per our agreement will become effective as of Sept. 16, 1944.

"Yours Truly,
"Newman Motor Co.
"By: /s/ L. F. LaFont."

It is not shown that plaintiff's bookkeeper had authority to write this letter and plaintiff denies that he did have.

There is a direct conflict in testimony as to just what agreement, if any, was reached by plaintiff and Captain Phelps in discussions prior to and after the mailing of the letter set out above. The greater weight of the evidence, however, is that, if any agreement was reached, it was that if the 12 Government-owned units were leased to plaintiff on terms quoted to him, he would make the rates set out in the above letter applicable to all units operated by him in transporting gasoline to the bases; but this agreement never went into effect because the 12 units were not leased to plaintiff, since an inspection by Captain Phelps revealed that the tractors were not suitable for use on the highways. Hence, plaintiff did not file the new tariffs referred to in the letter, but, until May 26, 1945, con-

tinued operating under the tariff issued on September 1, 1944. On May 26, 1945, he agreed to reduce his charges to the amount insisted upon by defendant and filed a tariff accordingly, effective July 1, 1945, which remained in effect for the rest of the time.

(Later, on February 1, 1945, plaintiff and defendant entered into a written lease-contract by which defendant leased to plaintiff four 4,000-gallon trailers, but the terms of this lease were different from the terms upon which it had been proposed to lease the 12 units and it is not shown that this lease had any connection with plaintiff's charges for transporting gasoline in his own trucks.)

Bills of lading covering all the gasoline transported by plaintiff were issued by Captain Phelps' office, and rates used in compiling plaintiff's bills were supplied by Captain Phelps. Until September 15, 1944, the rates supplied by Captain Phelps and used by plaintiff in computing his bills were the rates provided in his tariffs. From September 16, 1944 (the date specified in plaintiff's letter of September 18, 1944), until plaintiff ceased transporting gasoline, the rates supplied by Captain Phelps and used by plaintiff were based upon figures of 1.05 cents per gallon, instead of the tariff rate of 1.20 cents, for transportation of gasoline from the refinery to the base at Liberal, Kansas, and 1.68 cents per gallon, instead of the tariff rate of 1.98 cents, on shipments from the refinery to the base at Dodge City, Kansas. These figures were apparently computed on the basis of the rates mentioned in the above letter, i. e., 14 cents per mile plus $8.40 based on a load of 4,000 gallons.

Plaintiff frequently protested the payment of rates which were less than those appearing in his tariffs, and stated that when the work was completed he intended to file a claim for the difference between what he was being paid and the amount he was entitled to on the basis of the agreement concluded at the meeting of July 7, 1944. On April 28, 1948 he filed such a claim.

We do not think plaintiff is limited to the rates set out in the letter of September 18, 1944, nor to the amounts set out in the invoices, as more fully stated hereinafter.

Since plaintiff's petition was not filed until September 18, 1950, all of his claim is barred by the statute of limitations, except for charges for the transportation services performed between September 19, 1944 and August 16, 1945, both dates inclusive. All gasoline hauled to the base at Pratt, Kansas, was transported prior to September 19, 1944, and, hence, a claim based thereon is barred.

As stated, plaintiff seeks to recover the difference between the amount he actually received for transporting the gasoline and the amount he would have received had he been paid on the basis of rates equivalent to rail rates. Plaintiff also seeks to recover demurrage at the rate of $5.00 per hour. Defendant says plaintiff is not entitled to recover more than the amounts set out in the letter of September 18, 1944, or, in any event, not more than an amount computed on the basis of the tariffs filed by or for him.

■ The plaintiff alleges that the agreement made at the meeting of July 7, 1944, by which he was to receive the equivalent of rail rates for transporting the gasoline, governed during the entire period. We do not think so, because the Government representatives present at this meeting only had authority to enter into a temporary agreement as to rates, since final responsibility as to rates rested with the Chief of Transportation of the Army by virtue of Army Regulation 55–105 then in effect. The pertinent part of this regulation reads as follows:

"d. Negotiations with carriers relative to classification of commodities, including raw materials as well as finished products, terminal charges, switching charges, arbitrary charges, rates and fares, matter in tariffs, adjustments in connection with such matters, and policies pertaining to freight, passenger, or express shipments are the responsibility of the Chief of Transportation and all correspondence other than routine on these subjects will be referred to him.

"e. All communications respecting special rate quotations, rate equalization, embargoes, terminal facilities, switching or delivery arrangements, and unusual traffic conditions received from carriers by an officer in the field or in Washington, D. C., will be submitted promptly to the Chief of Transportation.

"f. No funds or personnel will be used in military establishments for the purpose of maintaining rate tariffs except in the Transportation Corps and the Finance Department.

"g. The Chief of Transportation may delegate such authority and duties as he deems proper and necessary."

■ Plaintiff claims that he had no knowledge of this Army Regulation, but this is immaterial because it is settled that he who enters into an agreement with the Government takes the risk that those who purport to act for the Government have the authority to do so. This is true even though the representatives of the Government may have been unaware of the limitations on their authority. Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10; Whiteside v. United States, 93 U.S. 247, 257, 23 L.Ed. 882.

In accordance with the agreement arrived at on July 7, 1944, plaintiff began operations under a temporary tariff, due to expire in August of that year. On July 22, 1944, plaintiff requested authority from the Interstate Commerce Commission to publish a permanent tariff, but this request was denied on August 5, 1944, because the Transportation Corps of the Army Service Forces, which had the sole authority to act in the matter of rates, objected to the rates requested by plaintiff. It is our opinion that the temporary agreement entered into on July 7, 1944, was at an end on the effective date of the superseding tariff agreed to by the Transportation Corps.

On September 1, 1944, the Transportation Corps withdrew its objections to

the tariff filed by plaintiff, and the Interstate Commerce Commission approved it. This specified the same rates specified in the temporary tariff. This tariff was effective as of September 5, 1944, and plaintiff operated under it until a new tariff went into effect on July 1, 1945.

It is our opinion that plaintiff was entitled to charge the rates appearing in this tariff for the entire period during which that tariff remained in effect. Although no express contract was entered into, we are of opinion that the parties impliedly agreed to the rates appearing in this tariff. The Transportation Corps, by withdrawing its objections to the tariff filed by plaintiff, indicated that the rates in the tariff were satisfactory to it. Plaintiff by filing the tariff agreed to the rates. Whether or not they were the equivalent of rail rates, they were satisfactory to plaintiff. Also, the agreement on rail rates was binding only for the temporary period. Nor did defendant make any definite representation that the rates set out in the temporary tariff, adopted by plaintiff in fixing permanent rates, were the exact equivalent of rail rates.

■ Defendant contends that plaintiff, by the letter of September 18, 1944, agreed to haul the gasoline at rates lower than those appearing in the tariff issued on September 1, 1944. We do not agree with this contention. The letter was dictated over the telephone to plaintiff's bookkeeper by Captain Phelps, the defendant's agent, and signed by plaintiff's bookkeeper. Plaintiff denies his bookkeeper had authority to write the letter, and defendant does not prove his authority. Defendant has not proven that plaintiff himself agreed to these rates until he filed his tariff on May 26, 1945 setting them out. This is the earliest date upon which plaintiff's agreement to them is shown. That plaintiff signed invoices based on these lower charges is not evidence of his agreement to them, because the invoices were prepared by defendant's agent, and plaintiff constantly protested against the charges so computed.

■ We are of opinion that plaintiff should have received payment based on the rates appearing in his tariff of September 1, 1944, for as long as it remained in effect. After the effective date of the new tariff filed on July 1, 1945, he is entitled to the rates fixed therein.

The parties have stipulated that plaintiff would have received $45,067.96 more than he actually received, had he been paid at the rates provided for in his tariffs on file from September 19, 1944 to August 16, 1945. Plaintiff is entitled to recover that amount, less the offset mentioned later. His claim prior to September 19, 1944, is barred by the statute of limitations.

■ The second problem presented for our consideration is plaintiff's claim for demurrage. The record reveals that plaintiff's trucks were often delayed in loading and in unloading during the time he hauled gasoline for the defendant. These delays were caused by a number of factors such as inadequate storage facilities at the bases and bad weather.

At the meeting of July 7, 1944, it was agreed that plaintiff would be paid demurrage at the rate of $5.00 per hour for all time, in excess of one hour of free time, required to complete the loading of each unit after it arrived at the refinery, and for all time, in excess of one hour of free time, required to complete the unloading of each unit after it arrived at the point of delivery. However, for reasons previously stated in this opinion, the agreement of July 7, 1944, was only a temporary agreement, and was not binding upon the defendant beyond the period of time that the temporary agreement remained in effect, which was until September 5, 1944.

There was no provision for demurrage in any of the tariffs filed by or for the plaintiff. The evidence does not clearly reveal the reason for this omission, but apparently it was because he did not claim it, since he never billed defendant for it while he was transporting the gasoline. Besides, under the arrangement

plaintiff was required to keep 28 units at defendant's disposal and could use them for no other purpose; hence, it made but little difference to plaintiff whether the trucks were standing in his yard or were waiting to be loaded or unloaded.

Moreover, plaintiff kept no records of the number of hours required to load and unload his units and he has given us no basis upon which to estimate such time. In any event, this claim must fail for want of proof.

Plaintiff alleges that it was agreed at the meeting of July 7, 1944, that he should receive demurrage at $5.00 per hour for all the time that his units were parked at Borger, Texas, as well as for the time, in excess of the free time allowed, required to load and unload his units. He claims he is due the total amount of $712,420.27 for the time his trucks were idle. We reject this claim for two reasons: (1) the evidence does not reveal that the parties ever agreed that plaintiff should receive demurrage for the time that his units were standing idle at Borger; (2) even if such an agreement was made, it was temporary only and not binding on defendant during the period of time not barred by the statute of limitations.

For the reasons stated, we must deny plaintiff's claim for demurrage.

On June 24, 1945, two of the Government-leased trailers and an accompanying dolly were damaged beyond repair while being operated by the plaintiff. Plaintiff admits that he is liable to defendant in the sum of $9,663.49 for the loss of this equipment. He also admits that he is liable in the sum of $295.26 for a load of gasoline that was lost when a truck overturned on August 2, 1944. These sums must be deducted from the $45,067.96 due plaintiff for transporting the gasoline.

The plaintiff is entitled to recover $35,109.21. Judgment for this amount will be entered.

It is so ordered.

JONES, Chief Judge, and LARAMORE, MADDEN, and LITTLETON, Judges, concur.