FEDERAL CROP INSURANCE CORP. *v.* MERRILL ET AL., DOING BUSINESS AS MERRILL BROS.

No. 45.   Argued October 16, 1947.—Decided November 10, 1947.

*Harry I. Rand* argued the cause for petitioner. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Ford* and *Paul A. Sweeney.*

*A. A. Merrill* argued the cause for respondent. With him on the brief was *O. A. Johannesen.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

We brought this case here because it involves a question of importance in the administration of the Federal Crop Insurance Act. 331 U. S. 798.

The relevant facts may be briefly stated. Petitioner (hereinafter called the Corporation) is a wholly Government-owned enterprise, created by the Federal Crop Insurance Act, as an "agency of and within the Department of Agriculture." Sec. 503 of Chapter 30, Act of February 16, 1938, 52 Stat. 72, 7 U. S. C. § 1503, as amended. To carry out the purposes of the Act, the Corporation, "Commencing with the wheat . . . crops planted for harvest in 1945" is empowered "to insure, upon such terms and conditions not inconsistent with the provisions of this title as it may determine, producers of wheat . . . against loss in yields due to unavoidable causes, including drought . . . ." 52 Stat. 74, § 508 (a) as

amended, 55 Stat. 255, in turn amended by the Act of December 23, 1944, Chapter 713, 58 Stat. 918, 7 U. S. C. (Supp. V, 1946), § 1508 (a).   In pursuance of its authority, the Corporation on February 5, 1945, promulgated its Wheat Crop Insurance Regulations, which were duly published in the Federal Register on February 7, 1945. 10 Fed. Reg. 1586.

On March 26, 1945, respondents applied locally for insurance under the Federal Crop Insurance Act to cover wheat farming operations in Bonneville County, Idaho. Respondents informed the Bonneville County Agricultural Conservation Committee, acting as agent for the Corporation, that they were planting 460 acres of spring wheat and that on 400 of these acres they were reseeding on winter wheat acreage.   The Committee advised respondents that the entire crop was insurable, and recommended to the Corporation's Denver Branch Office acceptance of the application.   (The formal application itself did not disclose that any part of the insured crop was reseeded.)   On May 28, 1945, the Corporation accepted the application.

In July, 1945, most of the respondents' crop was destroyed by drought.   Upon being notified, the Corporation, after discovering that the destroyed acreage had been reseeded, refused to pay the loss, and this litigation was appropriately begun in one of the lower courts of Idaho.   The trial court rejected the Corporation's contention, presented by a demurrer to the complaint, that the Wheat Crop Insurance Regulations barred recovery as a matter of law.   Evidence was thereupon permitted to go to the jury to the effect that the respondents had no actual knowledge of the Regulations, insofar as they precluded insurance for reseeded wheat, and that they had in fact been misled by petitioner's agent into believing that spring wheat reseeded on winter wheat acreage was insurable by the Corporation.   The jury

returned a verdict for the loss on all the 460 acres and the Supreme Court of Idaho affirmed the resulting judgment. 67 Idaho 196, 174 P. 2d 834. That court in effect adopted the theory of the trial judge, that since the knowledge of the agent of a private insurance company, under the circumstances of this case, would be attributed to, and thereby bind, a private insurance company, the Corporation is equally bound.

The case no doubt presents phases of hardship. We take for granted that, on the basis of what they were told by the Corporation's local agent, the respondents reasonably believed that their entire crop was covered by petitioner's insurance. And so we assume that recovery could be had against a private insurance company. But the Corporation is not a private insurance company. It is too late in the day to urge that the Government is just another private litigant, for purposes of charging it with liability, whenever it takes over a business theretofore conducted by private enterprise or engages in competition with private ventures.[1] Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the man-

[1] Judging from the legislative history of the Act, the Government engaged in crop insurance as a pioneer. Private insurance companies apparently deemed all-risk crop insurance too great a commercial hazard. See Report and Recommendations of the President's Committee on Crop Insurance, H. Doc. No. 150, 75th Cong., 1st Sess., pp. 2–4, 11–12; H. R. Rep. No. 1479, 75th Cong., 1st Sess., p. 2; 81 Cong. Rec. 2866, 2867, 2887, 2891, 2893, 2895; Hearings before a Subcommittee of the Senate Committee on Agriculture and Forestry on S. 1397, 75th Cong., 1st Sess., 125, 185. But this does not affect the legal issues. It merely underscores the fact that the undertaking by the Government is not an ordinary commercial undertaking, and thereby reenforces the conclusion that the rules of law whereby private insurance companies are rendered liable for the acts of their agents are not bodily applicable to a Government agency like the Corporation, unless Congress has so provided.

ner in which the Government conducts it. The Government may carry on its operations through conventional executive agencies or through corporate forms especially created for defined ends. See *Keifer & Keifer* v. *Reconstruction Finance Corp.,* 306 U. S. 381, 390. Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority. See, e. g., *Utah Power & Light Co.* v. *United States,* 243 U. S. 389, 409; *United States* v. *Stewart,* 311 U. S. 60, 70, and see, generally, *The Floyd Acceptances,* 7 Wall. 666.

If the Federal Crop Insurance Act had by explicit language prohibited the insurance of spring wheat which is reseeded on winter wheat acreage, the ignorance of such a restriction, either by the respondents or the Corporation's agent, would be immaterial and recovery could not be had against the Corporation for loss of such reseeded wheat. Congress could hardly define the multitudinous details appropriate for the business of crop insurance when the Government entered it. Inevitably "the terms and conditions" upon which valid governmental insurance can be had must be defined by the agency acting for the Government. And so Congress has legislated in this instance, as in modern regulatory enactments it so often does, by conferring the rule-making power upon the agency created for carrying out its policy. See § 516 (b), 52 Stat. 72, 77, 7 U. S. C. § 1516 (b). Just as everyone is charged with knowledge of the United States Statutes at Large,

Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents.   49 Stat. 502, 44 U. S. C. § 307.

Accordingly, the Wheat Crop Insurance Regulations were binding on all who sought to come within the Federal Crop Insurance Act, regardless of actual knowledge of what is in the Regulations or of the hardship resulting from innocent ignorance.   The oft-quoted observation in *Rock Island, Arkansas & Louisiana Railroad Co.* v. *United States,* 254 U. S. 141, 143, that "Men must turn square corners when they deal with the Government," does not reflect a callous outlook.   It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury.   The "terms and conditions" defined by the Corporation, under authority of Congress, for creating liability on the part of the Government preclude recovery for the loss of the reseeded wheat no matter with what good reason the respondents thought they had obtained insurance from the Government.   Indeed, not only do the Wheat Regulations limit the liability of the Government as if they had been enacted by Congress directly, but they were in fact incorporated by reference in the application,[2] as specifically required by the Regulations.[3]

---

[2] "H. Acceptance by the Federal Crop Insurance Corporation.— It is understood and agreed that upon acceptance of the application by a duly authorized representative of the Corporation as evidenced by his approval below, the insurance contract shall be in effect, provided the application has been submitted in accordance with the provisions of the application and the applicable Wheat Crop Insurance Regulations.   It is further understood and agreed that the accepted application and the applicable Wheat Crop Insurance Regulations, including any amendments thereto, constitute the contract between the Corporation and the insured."

[3] "§ 414.3 *Acceptance of applications by the Corporation.* (a) Upon acceptance of an application by a duly authorized representa-

We have thus far assumed, as did the parties here and the courts below, that the controlling regulation in fact precluded insurance coverage for spring wheat reseeded on winter wheat acreage. It explicitly states that the term "wheat crop shall not include . . . winter wheat in the 1945 crop year, and spring wheat which has been reseeded on winter wheat acreage in the 1945 crop year." (Sec. 414.37 (v) of Wheat Crop Insurance Regulations, 10 Fed. Reg. 1591.) The circumstances of this case tempt one to read the regulation, since it is for us to read it, with charitable laxity. But not even the temptations of a hard case can elude the clear meaning of the regulation. It precludes recovery for "spring wheat which has been reseeded on winter wheat acreage in the 1945 crop year." Concerning the validity of the regulation, as "not inconsistent with the provisions" of the Federal Crop Insurance Act, no question has been raised.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE BLACK and MR. JUSTICE RUTLEDGE dissent.

MR. JUSTICE JACKSON, dissenting.

I would affirm the decision of the court below. If crop insurance contracts made by agencies of the United States Government are to be judged by the law of the State in which they are written, I find no error in the court below.

---

tive of the Corporation, the insurance contract shall be in effect, provided such application is submitted in accordance with the provisions of the application and of these regulations, including any amendments thereto." 10 Fed. Reg. 1586. The regulation defined "insurance contract" as "the contract of insurance entered into between the applicant and the Corporation by virtue of the application for insurance and these regulations and any amendments thereto." 10 Fed. Reg. 1591.

If, however, we are to hold them subject only to federal law and to declare what that law is, I can see no reason why we should not adopt a rule which recognizes the practicalities of the business.

It was early discovered that fair dealing in the insurance business required that the entire contract between the policyholder and the insurance company be embodied in the writings which passed between the parties, namely, the written application, if any, and the policy issued. It may be well enough to make some types of contracts with the Government subject to long and involved regulations published in the Federal Register. To my mind, it is an absurdity to hold that every farmer who insures his crops knows what the Federal Register contains or even knows that there is such a publication. If he were to peruse this voluminous and dull publication as it is issued from time to time in order to make sure whether anything has been promulgated that affects his rights, he would never need crop insurance, for he would never get time to plant any crops. Nor am I convinced that a reading of technically-worded regulations would enlighten him much in any event.

In this case, the Government entered a field which required the issuance of large numbers of insurance policies to people engaged in agriculture. It could not expect them to be lawyers, except in rare instances, and one should not be expected to have to employ a lawyer to see whether his own Government is issuing him a policy which in case of loss would turn out to be no policy at all. There was no fraud or concealment, and those who represented the Government in taking on the risk apparently no more suspected the existence of a hidden regulation that would render the contract void than did the policyholder. It is very well to say that those who deal with the Government should turn square corners. But

there is no reason why the square corners should constitute a one-way street.

The Government asks us to lift its policies out of the control of the States and to find or fashion a federal rule to govern them. I should respond to that request by laying down a federal rule that would hold these agencies to the same fundamental principles of fair dealing that have been found essential in progressive states to prevent insurance from being an investment in disappointment.

MR. JUSTICE DOUGLAS joins in this opinion.