**KRAFT FOODS COMPANY OF WISCONSIN, a Wisconsin corporation, et al., Plaintiffs-Appellants,**

v.

**COMMODITY CREDIT CORPORATION, Defendant-Appellee.**

**No. 12481–12486.**

United States Court of Appeals Seventh Circuit.

April 29, 1959.

John T. Chadwell, Richard M. Keck, Rudy L. Ruggles, Jean Engstrom, Chicago, Ill., Glenn W. Stephens, Madison, Wis., for Kraft Foods Company of Wisconsin.

Stuart S. Ball, Richard J. Flynn, Chicago, Ill., Joseph A. Greaves, Chicago, Ill., R. M. Stroud, Madison, Wis., for The Borden Company.

W. Wade Boardman, Walter M. Bjork, Madison, Wis., Edward A. Mullery, Omaha, Neb., for The Cudahy Packing Company.

George E. Leonard, Jr., Louis R. Miller, Chicago, Ill., R. M. Stroud, Madison, Wis., for Armour and Co., and the Berst Corp.

Richard J. Faletti, Chicago, Ill., Glenn W. Stephens, Madison, Wis., for Safeway Stores, Inc.

W. Wade Boardman, Walter M. Bjork, Madison, Wis., for H. J. Heinz Co.

Claude A. Roth, Harry E. Smoot, Chicago, Ill., Glenn W. Stephens, Madison, Wis., for L. D. Schreiber & Co., Inc.

Marvin C. Taylor, Civil Division, Dept. of Justice, Washington, D. C., George E. Rapp, U. S. Atty., Madison, Wis., Robert Tieken, U. S. Atty., Chicago, Ill. (George Cochran Doub, Asst. Atty. Gen., on the brief), for appellee.

Before SCHNACKENBERG, PARKINSON and KNOCH, Circuit Judges.

SCHNACKENBERG, Circuit Judge.

In appeal No. 12481, Kraft Foods Company of Wisconsin, a Wisconsin corporation, and The Borden Company, a New Jersey corporation, in appeal No. 12482, The Cudahy Packing Corporation, a Maine corporation, in appeal No. 12483, Armour and Company, an Illinois corporation and The Berst Corporation, an Illinois corporation, in appeal No. 12484, Safeway Stores, Incorporated, a Maryland corporation, in appeal No. 12485, H. J. Heinz Company, a Pennsylvania corporation, and in appeal No. 12486, L. D. Schreiber & Co., a Delaware corporation, ask this court to reverse judgments of the district court, dismissing complaints for declaratory relief filed by said corporations [1] against Commodity Credit Corporation, defendant, herein referred to as "CCC", and awarding monetary recovery against each of said plaintiffs on defendant's counterclaims.[2]

By their actions, plaintiffs sought a declaratory judgment that they were not obligated to repay to CCC certain sums of money paid to them by CCC pursuant to contracts entered into in the spring of 1954, and that the Department of Agriculture, herein referred to as "Agriculture", had authority, in connection with its support of prices of dairy products, to establish in the spring of 1954 a "purchase and resale program", and to make, through CCC, the payments thereunder which were thereafter demanded back by the Department of Justice relying on the authority of United States v. Wurts, 303 U.S. 414, 58 S.Ct. 637, 82 L. Ed. 932.

On August 15, 1955, the Comptroller General of the United States published his opinion that the applicable statute, 7 U.S.C.A. § 1421 et seq., did not authorize the disbursements. On May 8, 1956 the Department of Justice demanded return,

for the account of CCC, of the disbursements made to plaintiffs.

Answers to plaintiffs' complaints in the suits at bar were filed in the name of CCC, alleging lack of authority to make the disbursements; and also counterclaims seeking their recapture with interest and costs.[3]

The court below held that the purchase and resale program and the disbursements thereunder were not authorized by the basic statute, and ordered their repayment together with interest from the date when the Department of Justice demanded their return. 164 F.Supp. 168.

The judgments below were for the *net* amount of the monies received by plaintiffs ($1,062,092.27), and interest.

Certain sections of the Commodity Credit Corporation Charter Act, 15 U.S. C.A. § 714 et seq., provided for the creation and purpose of CCC. Among the powers conferred specifically are those in § 714c, as follows:

\* \* \* \* \*

" \* \* \* the Corporation is authorized to use its general powers only to—

"(a) Support the prices of agricultural commodities through loans, purchases, payments, and other operations. \* \* \* "

Pertinent parts of the Agricultural Act of 1949, 7 U.S.C.A. § 1421 et seq., we now set forth:

§ 1421 provides:

"(a) The Secretary shall provide the price support authorized or required herein through the Commodity Credit Corporation and other means available to him.

"(b) Except as otherwise provided in this Act, the amounts, terms, and conditions of price support operations and the extent to which

---

1. These actions were consolidated for trial.

2. These appeals were consolidated for hearing in this court.

3. Plaintiffs contend that the Secretary of Agriculture and the officials of CCC and

Agriculture have, however, steadfastly maintained that the contracts were valid.

Counsel for the U. S. Department of Justice have appeared herein for CCC, contending that the contracts were unauthorized.

such operations are carried out, shall be determined or approved by the Secretary. * * * "

§ 1426 provides:

"The Secretary shall, insofar as practicable, announce the level of price support for * * * agricultural commodities in advance of the beginning of the marketing year * * * the level of price support so announced shall not be reduced if the maximum level of price support when determined, is less than the level so announced."

§ 1427 provides:

"The Commodity Credit Corporation may sell any farm commodity owned or controlled by it at any price not prohibited by this section. In determining sales policies for basic agricultural commodities or storable nonbasic commodities, the Corporation should give consideration to the establishing of such policies with respect to prices, terms, and conditions as it determines will not discourage or deter manufacturers, processors, and dealers from acquiring and carrying normal inventories of the commodity of the current crop. The Corporation shall not sell any basic agricultural commodity or storable nonbasic commodity at less than 5 per centum above the current support price for such commodity, plus reasonable carrying charges. * * * "

§ 1428 provides:

"*Definitions*

"For the purposes of this Act—

"(a) A commodity shall be considered storable upon determination by the Secretary that, in normal trade practice, it is stored for substantial periods of time and that it can be stored under the price-support program without excessive loss through deterioration or spoilage or without excessive cost for storage for such periods as will permit its disposition without substantial impairment of the effectiveness of the price-support program.

* * * * * *

"(c) A 'basic agricultural commodity' shall mean corn, cotton, peanuts, rice, tobacco, and wheat, respectively.

"(d) A 'nonbasic agricultural commodity' shall mean any agricultural commodity other than a basic agricultural commodity."

§ 1429 of the Act provides:

"Determinations made by the Secretary under this Act shall be final and conclusive: *Provided,* That the scope and nature of such determinations shall not be inconsistent with the provisions of the Commodity Credit Corporation Charter Act."

§ 1446, reads as follows:

"*Price support levels for designated nonbasic agricultural commodities*

"The Secretary is authorized and directed to make available (without regard to the provisions of sections 1447–1449 of this title) price support to producers for wool (including mohair), tung nuts, honey, Irish potatoes, milk, butterfat, and the products of milk and butterfat as follows:

"(a) The price of wool (including mohair) shall be supported through loans, purchases, or other operations at such level, not in excess of 90 per centum nor less than 60 per centum of the parity price therefor, as the Secretary determines necessary in order to encourage an annual production of approximately three hundred sixty million pounds of shorn wool;

"(b) The price of tung nuts, honey, and early, intermediate, and late Irish potatoes, respectively, shall be supported through loans, purchases, or other operations at a level not in excess of 90 per centum nor less than 60 per centum of the parity price therefor;

"(c) The price of whole milk, butterfat, and the products of such commodities, respectively, shall be supported at such level not in excess of 90 per centum nor less than 75 per centum of the parity price therefor as the Secretary determines necessary in order to assure an adequate supply. Such price support shall be provided through loans on, or purchases of, the products of milk and butterfat. Oct. 31, 1949, c. 792, Title II, § 201, 63 Stat. 1052."

■ 1. Of course, it is not for us to determine whether the statutory plan of price supports set up by congress is wise. There being no contention that congress exceeded its constitutional powers in the legislation enacting this plan, the wisdom thereof is exclusively a legislative matter.

■ Nor have we any right to question the acts of the designated agencies in administering the Act, in the absence of charges of fraud or bad faith, if the agencies acted within the framework of the Act and did not abuse their discretion.

CCC asserts that support was never accorded through loans and says that the issue is whether the transactions under a special program established by Agriculture, known as anouncement Da–112, were "purchases" within the meaning of that word as used in the Act.

CCC reasons in its brief:

"The *theory* of the purchase method is that manufacturers and handlers of cheese, butter and milk powders can afford to pay and therefore will pay farmers the desired 'support prices' for their milk and butterfat because the investment in cheese, butter and milk powders can always be recovered through sales to CCC if the open market will not absorb the goods at that price. * * * CCC's purchases have been limited to the products named above because the perishability of the raw materials made their purchase by CCC impractical, and because of the belief that support through purchases of the designated products would tend to support prices for milk for all uses. * * *

"Agriculture did not check up on whether persons offering products to CCC did in fact pay 'support prices' to farmers for the milk and butterfat used in making the products offered to it; nor insist that such 'support prices' be paid as a condition of offerings to CCC. * * *

"This is what is called the 'purchase method' of support, as distinguished from the 'payment method.' * * * The Secretary of Agriculture * * * and the Solicitor of Agriculture * * * and the Attorney General * * * have ruled that price support of dairy products under the 1949 statute is limited to the purchase method, and that support through 'payments' or 'other operations'—both of which have been used at one time or another in connection with support of some other agricultural products—is not permissible in supporting dairy products."

The record shows that, under date of February 18, 1954, Agriculture announced support prices for manufacturing milk and butterfat, the prices being based on 75% of parity support level, compared with 90% for the 1953–54 marketing year. The announcement stated that, in carrying out this support program, defendant would offer to purchase butter, cheddar cheese, and nonfat dry milk solids in carlot quantity during the period April 1, 1954 through March 31, 1955, and the support prices for manufacturing milk and butterfat for the 1954–55 marketing year reflect 75% of the parity equivalent for manufacturing milk and the parity price for butterfat.[4] Defendant also announced that it would buy through March 31, 1954 at specified

---

4. The support price for manufacturing milk for the 1954–55 marketing year was based on 88.5 percent of the parity price for all milk.

prices certain grades of butter, cheddar cheese and nonfat dry milk solids. On March 9, 1954 Agriculture's announcement Da–112 stated that, for the remainder of March, it was prepared, through defendant, to purchase certain butter, cheese and milk.

"* * * under the present program to support prices of manufacturing milk to producers and to resell these commodities to their offerers at CCC domestic sales prices in effect during April. For this purpose certain requirements of the present price support purchase programs for these commodities are being changed.

"Purchases made under this Announcement Da–112 will be limited to commodities which the offerer agrees to repurchase from CCC as hereinafter provided. * * *

*       *       *       *       *

"How To Submit An Offer.

"Offers may be submitted so as to be received daily through close of business March 31, 1954, by letter or telegram to the CSS Commodity Office serving the area in which the product is located * * *. Offers received each day, if in accordance with the terms of this announcement, will be subject to acceptance by the CCC by telegram * * *.

*       *       *       *       *

"* * * All offers must state the following:

*       *       *       *       *       *

"h. An offer to repurchase the commodity from CCC on April 1 or on the date the commodity is delivered to CCC, whichever is later, at the CCC domestic sales price for the commodity concerned in effect on April 1 or on the date of delivery to CCC, whichever is later."

Da–112 also stated that "upon acceptance by the CCC the offer and acceptance shall constitute a valid and binding contract." It also provided for an opportunity for Agriculture to inspect samples of the commodity located in storage suitable to defendant.

In paragraph 8 the prices to be paid by defendant for commodities offered were listed.

Paragraph 9, Delivery, provided that cheese was to be owned or under consignment to offerer not later than March 31, 1954, and delivery thereof and transfer of title thereto to be effected at the time it was graded or when offer was accepted, whichever was later. All commodities were subject to quality requirements.

In addition, Da–112, in paragraphs 9 and 10, provided that the

"* * * offerer, at his expense, shall hold for CCC at the location at which it is graded * * * and delivered, the commodity which he has delivered to CCC from the time of delivery until CCC redelivers the commodity to the offerer. Failure of the offerer to hold the commodity for CCC until its redelivery to the offerer shall render the contract void.

"* * * The offerer by submitting an offer to repurchase * * * agrees that * * * on April 1 or on the date on which delivery to CCC is effected, whichever is later, for cheese * * * to repurchase the commodity sold by offerer to CCC under terms of this contract at the CCC domestic sales price effective on such date of repurchase regardless of the quality or condition of the commodity, it being agreed for the purpose of this offer to repurchase that the commodity will on the date of such repurchase be of the same grade and quality as when sold by offerer to CCC.

"Provided, however:

"That if the CCC domestic sales price in effect on the date of redelivery to the offerer is greater than the March 31 CCC price support purchase price for the commodity concerned CCC will, at the offerer's request amend his contract to relieve

him of liability to repurchase the commodity and to provide for its sale to CCC under the terms of Announcements Da–99, 100, 101, and 102, as amended.

"Provided, further:

"That if the CCC domestic sales price in effect on the date of redelivery to the offerer is greater than the March 31 CCC price support purchase price for the commodity concerned, CCC will, at the offerer's request, render his contract void."

Paragraph 11 provided:

" * * * Delivery by CCC to offerer shall be effected on April 1 or on the date on which the commodity is delivered to CCC, whichever is later. Delivery of the commodity to CCC in accordance with the paragraph entitled 'DELIVERY' above shall effect redelivery by CCC to the offerer on April 1 or on the date CCC takes delivery, whichever is later."

Paragraphs 12, 13 and 14 provided:

"Commodities offered for sale under the terms of this announcement shall remain in the place and in the form in which they are sampled or graded from the time of the sampling or grading until they are delivered to CCC and finally until title revests in the offerer.

"Commodities sold to CCC under the terms of this announcement for resale to the offerer shall be stored by the offerer in such a manner as will protect them from deterioration and shall be handled in accordance with good commercial practice. Any storage, handling or transportation charges connected with the sale of the commodities to CCC or with their resale to the offerer or with their care and protection during the term of a contract under this announcement shall be for the account of the offerer. The offerer by submitting an offer agrees to act as insurer to CCC of the commodities and their quality while title to commodity is in CCC and offerer shall assume all risk of loss.

"Settlement for commodities purchased and resold under the terms of this announcement shall be made after redelivery to offerer on the basis of vouchers or certified invoices submitted by the offerer in each case claiming the net difference between the sales price to CCC and the sales price from CCC to offerer. Vouchers or invoices shall contain the statement 'The commodity remained in the place in which it was sampled or graded from the time of sampling or grading until repurchase and redelivered to the offerer,' and shall be supported by USDA grading and inspection certificates. Settlement will be made on the basis of the nearest even net pound."

Plaintiffs seek a reversal of the judgment below "because the challenged transactions clearly constituted purchases authorized by the Agricultural Act of 1949." On the other hand, CCC insists that these transactions under Da–112 were not "purchases" within the meaning of that word in § 1446(c) of the Act.

■ It is we think significant that § 1446 authorizes the Secretary to support the price of wool and the price of tung nuts, honey, and Irish potatoes, through loans, purchases, *or other operations*, but states that the price support of whole milk, butterfat, and the products of such commodities, shall be provided through loans on, or purchases of, the products of milk and butterfat. The omission of the words "other operations" when dealing with the products of milk and butterfat is conspicuous and must be given effect. It is not contended that the transactions involved in this case were loans. Hence, it follows, that whether or not they were authorized by the Act depends on whether they were purchases. If they were not purchases then they were not within the framework of the Act and the payments made by CCC for plaintiffs' products were unauthorized.

Plaintiffs reason that whether the term "purchases" is given its legal mean-

ing or whether it is construed in the light of the whole legislative purpose, the conclusion must be the same, while CCC says that the word is to be given its "normal meaning", and recedes somewhat from that position in saying that the word is "well-known in case law and under the Uniform Sales Act."

Inasmuch as both parties refer to the normal meaning of the word, we will adopt that meaning rather than choose among the varying meanings to be found in case law and the provisions of the Uniform Sales Act (which is not in effect in all parts of the United States). Webster's New International Dictionary defines "purchase" as follows: "the acquisition of title to, or property in, anything for a price." The word as thus defined fits into the price support plan established by the Act and the word should be interpreted with the context of the Act in such a way as to accomplish the evident purpose of congress.

Contending that these transactions were not purchases by it, CCC points out (a) that the plaintiffs' combination offer to sell and to rebuy was not absolute and final, but only conditional,[5] (b) that acceptance of offers did not effect sales, but merely contracts to sell from which the offerer could be relieved if he changed his mind,[6] (c) that the cheese did not have to be in existence at the time of the offer and acceptance, its being in existence by March 31, 1954 being sufficient, even though the offer and acceptance had occurred earlier,[7] (d) all goods had to pass Agriculture's inspection as to grade, according to paragraphs 4, 5 & 9 of Da–112, (e) under paragraph 13 of Da–112, the risk of loss was placed on the offerer, (f) physical delivery never occurred, nor was it intended, the owners continuing to treat the goods as part of their inventories, (g) CCC was not free to sell or give away or otherwise deal as an owner with goods it had "purchased," (h) it was committed to their alleged "resale" to the offerer, (i) the transactions under Da–112 did not effect removal of the goods from the market, such removal through final and unqualified sales of dairy products to CCC being the essence of the "purchase method" of support.[8]

With commendable forthrightness plaintiffs in their main brief call our attention to Swift & Co. v. United States, 4 Cir., 257 F.2d 787, certiorari denied, 358 U.S. 837, 79 S.Ct. 60, 3 L.Ed.2d 73, rehearing denied, 358 U.S. 901, 79 S.Ct. 220, 3 L.Ed.2d 152, which is in accord with the main result reached in the district court in this case. They seek to distinguish the Swift case on the ground that the defendants there

"  *  *  *  took the position that the word 'purchases,' the key to all legal issues in the case, could, as used in the Act, only be interpreted broadly to include all transactions that served the economic objectives of the Act. The plaintiffs herein, on the other hand, have always conceded, indeed, as pointed out in the preceding sections, they have argued for, the more restricted interpretation—that 'purchase' meant a legal sale. A consequence of the position that Swift took was that the question

---

5. Paragraph 10 of Da–112 provided that, if the CCC domestic sales price for cheese or for butter effective on April 1, 1954 should be higher than CCC's 1953–54 purchase price, the offerer had an option to amend the arrangement into a contract to sell to CCC free from any obligation to rebuy or to declare it wholly void. Since the occasion for exercising the offerer's option would not occur until April 1, 1954, it follows that the offers were conditional until then, and that no property in the goods could have passed from the offerer before that date.

6. Da–112 provided that retention of the goods by the offerer until April 1, 1954 or the date of inspection (whichever was later) was a condition of his right to payment; and that his failure to retain the goods for this period "shall render the contract void."

7. Pars. 5, 9 of Da–112.

8. We do not base our decision on the foregoing contention (i), inasmuch as considerable doubt is cast upon its validity by the provisions of § 1427 of the Act, supra.

of whether or not Da–112 transactions constituted legal sales was never adequately presented or argued to the trial court or to the Court of Appeals in the Swift proceedings."

They reiterate that the Da–1112 transactions constituted *"legal* sales".

We do not believe that plaintiffs have thus actually distinguished the Swift decision from this case in the posture in which we view it. We would not be justified in ignoring Swift as a precedent merely because plaintiffs find that the court in that case was not asked to apply the *legal* meaning of the word "purchase". We reject that restricted interpretation of that word. As stated, supra, we are in accord with the normal meaning.

■ We approve of the following language used by the court in the Swift case, 257 F.2d at page 794:

" * * * The so-called sales of cheese and butter by the processors were not purchases by CCC in any normal sense of the word. The products never left the possession of the processors or came into the hands of the United States and were never intended to do so. In short, the products never moved and there was no delivery or intention to deliver. Storage, handling and transportation charges connected with the sale or resale were 'for the account of the offerer' (processor), and the offerer assumed all risk of loss. The Government through CCC obtained no right to sell the goods to other parties but was obliged to resell them at a loss to the processor. On the other hand, the processor not only retained physical possession of the products but full power to disregard his contract to sell and repurchase and to dispose of or sell them to anyone he pleased without incurring any liability to the Government. CCC did not pay for the products which it purported to buy and the processors did not pay for the products which they purported to buy back. Both transactions were settled by one check of the CCC for the loss incurred in the transaction, which it agreed in advance to assume."

While the United States Supreme Court never granted review of the decision of the Court of Appeals, in the Swift case, we are not unmindful of the fact that on two occasions it refused to do so. Although the denial of a writ of certiorari embodies no expression of opinion upon the merits of the case, United States v. Carver, 260 U.S. 482, 490, 43 S.Ct. 181, 67 L.Ed. 361; House v. Mayo, 324 U.S. 42, 48, 65 S.Ct. 517, 89 L.Ed. 739; Sunal v. Large, 332 U.S. 174, 181, 67 S.Ct. 1588, 91 L.Ed. 1982, and simply means that as a matter of "sound judicial discretion" fewer than four members of the court deemed it desirable to review a decision of a lower court, Agoston v. Commonwealth of Pennsylvania, 340 U.S. 844, 71 S.Ct. 9, 95 L.Ed. 619, our attention has been called to no language used by the Court impelling us to the conclusion that the members of the Court who did not vote for certiorari in the Swift case were indifferent to the opinion or the result in the Court of Appeals. Considering that the case involved an important segment of the government price control program for agricultural products, pertaining to the economic life of the nation, and also a substantial monetary claim of CCC, the lack of at least four votes for granting certiorari cannot realistically be considered meaningless to federal courts who are asked to follow the Court of Appeals decision in Swift as a correct interpretation of the law. In view of the nature of the case, the fact that some justices (which could be as many as six or more) did not vote for certiorari is at least an indication that they either did not disapprove, or did not doubt, the correctness of the ruling below.

■ We hold that in the transactions in question CCC did not at any time ac-

quire title to, or property in, the cheese offered by plaintiffs, and that, therefore, there was no purchase in the normal meaning of that word. For that reason the payments made by CCC were not authorized by the Act, and CCC was entitled to recover them from plaintiffs. The district court did not err in entering judgment therefor. To the same effect is Land O'Lakes Creameries, Inc. v. Commodity Credit Corporation, 8 Cir., 265 F.2d 163.

2. In its counterclaim CCC prays for interest against plaintiffs on the sums of payments made to them in connection with the alleged purchases of cheese. The district court allowed interest against plaintiffs from the date of demands for repayment to the date of entry of judgments. In this court plaintiffs seek a reversal of the allowance of interest against them.

■■ CCC in its brief relies on Wisconsin Central R. Co. v. United States, 164 U.S. 190, 17 S.Ct. 45, 41 L.Ed. 399, which, in our opinion, establishes that an action such as involved in the counterclaims herein is for money had and received. The court, 164 U.S. at page 212, 17 S.Ct. at page 52, said: "We concur in these views, and are of the opinion that there is nothing on this record to take the case out of the scope of the principle that parties receiving moneys illegally paid by a public officer are liable *ex aequo et bono* [9] to refund them." Therefore, CCC is asserting actions in quasi contract. A quasi contract rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another, and on the principle that whatever it is certain that a man ought to do, that the law supposes him to have promised to do. 17 C.J.S. Contracts § 6, p. 324. In this case, the district court found [10] that all parties acted in good faith. The record reveals, moreover, that the plan embodied in Da–112 was the product of the government agencies involved, and not of plaintiffs. The latters' able counsel make a strong, although unsuccessful, argument that these transactions were in conformity with the literal technical provisions of the Act. All of these circumstances convince us that we must refuse on equitable grounds to approve the charging of interest against plaintiffs up to the date of the judgments below. To the same effect, see Swift & Co. v. United States, supra, 257 F.2d 796; Land O'Lakes Creameries, Inc. v. Commodity Credit Corporation, supra. In allowing said interest, the district court abused its discretion.

For the foregoing reasons, the judgments from which these appeals have been taken are reversed insofar as ante-judgment interest was allowed against plaintiffs, and said cases, to that extent only, are remanded to the district court with instructions to enter suitable remittiturs, and in all other respects said judgments are affirmed.

In part affirmed, and in part reversed and remanded.

9. Black's Law Dictionary, p. 659: "A phrase derived from the civil law, meaning, in justice and fairness; according to what is just and good; according to equity and conscience. 3 Bl.Comm. 163."

10. 164 F.Supp. 168, 183.