**UNITED STATES of America,**
**Plaintiff,**

v.

**ZENITH–GODLEY COMPANY, Inc.; J. R. Kramer, Inc.; Carl Ahlers, Incorporated; S & W Waldbaum, Incorporated; W. W. Elzea, Incorporated; Dari-Best Butter Company, Incorporated; Llewellyn Watters, Jr., Llewellyn Watts, III, d/b/a Watts & Sons; and Francis E. Walton, Thomas G. Corcoran, John Hunter Walton, Henry A. Walton and Elmer J. Reilly, d/b/a Hunter, Walton and Co., Defendants.**

United States District Court.
S. D. New York.
Feb. 8, 1960.

---

S. Hazard Gillespie, Jr., U. S. Atty., Southern Dist. of New York, New York City, for plaintiff, by Myron J. Weiss, Asst. U. S. Atty., New York City, of counsel.

Landis, Feldman, Reilly & Akers, New York City, for defendants, by James M. Landis, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

In this consolidated action [1] the United States seeks the return of sums paid to the defendants by the Department of Agriculture through the Commodity Credit Corporation, under authority purportedly granted by 7 U.S.C. A. § 1446(c). Plaintiff contends that such payments exceeded the authority granted the Secretary of Agriculture by the statute, and thus the government is entitled to repayment of the monies disbursed, with interest from the date of the

[1.] Eight separate actions were consolidated by a stipulation entered June 15, 1959. There are no differences among the defendants save in the amounts claimed from them by the government.

allegedly unauthorized payment, or at least from the date of the government's first demand for repayment.[2] Defendants claim (1) that the payments were authorized by statute; (2) that even if the payments were not authorized, the government is not entitled to repayment at this time; and (3) that in any event, interest should be taxed only from the date of the judgment in this action. Both sides have moved for summary judgment.

The payments which the government now seeks to recover were made by the Department of Agriculture to these defendants, manufacturers, distributors or handlers of butter, as part of the government's comprehensive plan for the support of the price of farm commodities. That plan is set forth in the Agricultural Act of 1949, 7 U.S.C.A. § 1421 et seq. The specific portion of that statute which pertains to the support of milk and milk products is section 1446, which provides:

> "The Secretary [of Agriculture] is authorized and directed to make available * * * price support to producers for * * * milk, butterfat, and the products of milk and butterfat as follows: * * * (c) The price of whole milk, butterfat, and the products of such commodities, respectively, shall be supported * * *. Such price support shall be provided through loans on, or purchases of, the products of milk and butterfat."

Pursuant to this section the Department of Agriculture issued complex regulations setting forth the procedures to be followed by butter handlers in utilizing the support program. These regulations were generally contained in "Departmental Announcements" which were sent to persons interested in the distribution of milk products. Until the early part of March 1954 the standard procedure for

butter price supports was contained in two Departmental Announcements, DA–99 and DA–107. The former was a standing invitation for offers to sell butter to the Commodity Credit Corporation (CCC) at prices varying by grade and from city to city; the latter was a standing invitation for offers to purchase butter (and cheese) from the CCC at prices to be announced each month which, in the case of butter, were always 3¢ below the price at which the CCC would purchase. The announcements contained fairly detailed provisions for inspection, grading, etc., but basically they set up a procedure whereby butter handlers could sell and ship butter to the CCC at one price and then repurchase the same or similar butter later at a lower price. The gain realized by the handlers was to be reflected in the price paid their suppliers.

On March 9, 1954, for complex reasons not material to the instant decision, the Department decided to vary the procedure outlined above, and this change was reflected in DA–112. While that announcement made many changes in details of inspection, packaging and grading, it differed from the DA–99—DA–107 procedure by providing that butter (and cheese) handlers could "sell and repurchase" their produce from the CCC without having to ship it to that agency. In effect, DA–112 was a paper transaction, which resulted in the Government owing the butter handlers 3¢ on every pound of butter "sold".

On August 15, 1955, the Comptroller General of the United States issued an opinion holding that the DA–112 transactions were not "purchases" for purposes of 7 U.S.C.A. § 1446(c) and thus the payments made under that Announcement were unauthorized. Early in May 1956 the Justice Department demanded repayment of all monies disbursed under DA–112, under threat of suit. All these demands were ignored and various ac-

---

**2.** No special statute is required upon which to base an action by the government for the return of money disbursed without authority. See United States v. Wurts, 1938, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932; Grand Trunk Western R. Co. v. United States, 1920, 252 U.S. 112, 121, 40 S.Ct. 309, 64 L.Ed. 484; Wisconsin Cent. R. Co. v. United States, 1896, 164 U.S. 190, 212, 17 S.Ct. 45, 41 L.Ed. 399.

tions, among them the instant one, ensued.

■ The first question which must be decided is whether the DA–112 transactions were authorized by the Agricultural Act of 1949. If the transactions were authorized, the government's claim for repayment must fail at its inception. That precise question, however, has already been passed upon by the courts of three circuits. All have decided the question in favor of the government.[3] In all these decisions the legislative and historical background of the DA–112 transactions was examined carefully, extensively and exhaustively, and a reading of these decisions is convincing beyond peradventure that the "paper transactions" provided in DA–112 exceeded the authority granted the Department of Agriculture by 7 U.S.C.A. § 1446. On the question of the statutory authority for the DA–112 transactions these decisions are dispositive, not because they are authorities that bar this Court from independent determination, but because their reasoning is totally convincing.[4]

The determination that the DA–112 transactions exceeded the statutory authority of the Department of Agriculture, however, does not in itself dispose of the instant action. In this case, the defendants have raised issues which, it appears, were not raised in the cases cited. Briefly stated, the defendants now contend that even if the DA–112 transactions were unauthorized, the government nevertheless may not recover the disbursements made, for to do so would not comport with the best rules of law and equity.

The factual basis of this claim is that the defendants entered into the DA–112 transactions in reliance upon representations of the Department of Agriculture, and thereby gave up their opportunity to achieve substantially the same return by utilizing the sale and repurchase techniques outlined in DA–99 and DA–107. The defendants point especially to the fact that the covering letter attached to DA–112 stated:

"You are cautioned to read these announcements carefully and utilize announcement DA–112 exclusively for sales of products to be repurchased." [5]

They also point to the fact that there is no suggestion by the government that both the Department of Agriculture and the butter handlers were not in complete good faith in believing that the transactions into which they were entering were authorized by statute. Furthermore, they urge, that the procedures utilized under DA–112, even if in fact unauthorized by the statute, were not so palpably

---

3. Kraft Foods Co. of Wisconsin v. Commodity Credit Corporation, D.C.W.D.Wis. 1958, 164 F.Supp. 168, affirmed 7 Cir., 1959, 266 F.2d 254; Land O'Lakes Creameries, Inc. v. Commodity Credit Corporation, 8 Cir., 1959, 265 F.2d 163; United States v. Swift & Co., D.C.D.Md. 1957, 152 F.Supp. 738, affirmed 4 Cir., 257 F.2d 787, certiorari denied 1958, 358 U.S. 837, 79 S.Ct. 60, 3 L.Ed.2d 73.

4. Defendants, apparently aware of the weight of the prior decisions, do not press very vehemently their argument that the DA–112 transactions were in fact authorized by statute. Insofar as they make any argument at all, they seek to distinguish the previous cases by arguing that they dealt with cheese handlers only, and that there were significant differences between DA–112 transactions as applied to cheese and as applied to butter. This argument must fail for two reasons.

First, the prior cases dealt with butter transactions, as well as cheese transactions. See, e. g. United States v. Swift & Co., D.C.D.Md.1957, 152 F.Supp. 738, 744. ("Butter and cheese are the only products involved in these cases.") Second, the most the defendants have been able to establish is that the DA–112 transactions tended to provide a windfall to cheese handlers not available, at least in the same degree, to dealers in butter. Such a conclusion would go only to show that the DA–112 procedure was more unwise in regard to cheese than in regard to butter. But, the wisdom of an executive program, is legally irrelevant when the question is whether that procedure was authorized by statute. In this case, it is clear that legislative authority was lacking.

5. See Exhibit A, attached to the affidavit of Llewellyn Watts, Jr.

unauthorized that anyone could be charged with recognition of their incorrectness without proof of actual knowledge. Thus, the defendants contend, it is the government's error that led to the defendants' change of position, now irrevocable, and the government should not be allowed to recover the monies paid out.

The defendants have attempted to place this factual claim into several legal frameworks. They rely first on the equitable element in actions for the recovery of money paid by mistake.

"Any change of circumstances which would be likely thereafter to cause the recipient entire or partial loss if the claimant were to obtain full restitution, is such a change as prevents full restitution, if the recipient was not guilty of a tort nor substantially more at fault than the claimant." Restatement of Restitution, § 142, comment "b" (1937). See also Keener, Law of Quasi-Contracts, 69, 71 (1893); Costigan, Change of Position as a Defense in Quasi-Contracts, 20 Harv.L.Rev. 205, 212 (1912); Woodward, The Law of Quasi-Contracts, § 25(5) (1913); Stone v. White, 1936, 301 U.S. 532, 535, 57 S.Ct. 851, 81 L.Ed. 1265.

The defendants argue that they changed their position to their detriment by being forced to forego the DA–99—DA–107 procedure, and that the mistake was the government's and not theirs.

This same result may be reached by phrasing the defense position in terms of estoppel, for estoppel also depends, to a great extent, upon a detrimental change of position caused by the incorrect representation of a party later seeking legal redress.[6]

This position, no matter how legally phrased, has much initial impact. But no matter how phrased, it founders on one circumstance of this case not sufficiently considered by the defendants: the party seeking restitution is the United States of America.

■ Whatever the result of this action might be were it between two private litigants, it seems clear that the same rules do not apply when one of the parties is the United States Government.

"It is too late in the day to urge that the Government is just another private litigant, for purposes of charging it with liability * * *." Federal Crop Ins. Corp. v. Merrill, 1947, 332 U.S. 380, 383, 68 S.Ct. 1, 3, 92 L.Ed. 10.

While a private person may be bound by acts of his agents that are not within the actual bounds of the agent's authority, it does not follow that the Government may be bound by the apparent authority of its agents.

"Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority." Federal Crop Ins. Corp. v. Merrill, supra, 332 U.S. at page 384, 68 S.Ct. at page 3.

This principle has been followed without exception since the Merrill case. See, e.

6. The plaintiff argues that the defendants cannot claim a detrimental change of position since they lost, at the most, an opportunity to have a gratuitous benefit conferred upon them by the government. I find it difficult to classify payments under a Congressional plan to provide for the health and welfare of the nation as gratuities. Congress, acting for the nation, was seeking certain beneficial results which were expected to flow from the Agricultural Act of 1949, and whether or not those results did in fact materialize, they were the "consideration" for its offers of assistance under the Act.

g. United States v. Hoffart, 8 Cir., 1958, 256 F.2d 186, 192; Government of Virgin Islands v. Gordon, 3 Cir., 1957, 244 F.2d 818, 820–821; Beatty v. United States, 8 Cir., 1955, 227 F.2d 350, 352; Sanders v. Commissioner of Internal Revenue, 10 Cir., 1955, 225 F.2d 629, 634.

■ In the cases cited above, it is well understood that another principle follows from the conclusion that no one may rely upon the apparent authority of an agent of the government. That second principle is that the government may not be estopped by the action or representation of an agent not within the scope of his actual authority. See, e. g. Sanders v. Commissioner of Internal Revenue, supra:

> "It is equally well established that the United States may not be estopped by the unauthorized acts of its agents nor may such agents waive the rights of the United States by their unauthorized acts."

This extension from the rule that no one may rely upon a government agent's apparent authority is necessary and logical. It would be meaningless to hold on the one hand that an agent cannot bind the government directly unless he has actual authority, and then hold on the other hand that he may bind the government by his own representation of his authority, thus raising an "estoppel".

It may be argued, however, that there is a key difference between apparent authority and estoppel as grounds for binding a party to a contract. The former will bind the principal to the contract whether or not there has been detrimental reliance by the other party, for if an agent is found to have apparent authority, that will be sufficient to raise a true contract. In the case of estoppel, however, the factor of detrimental reliance must ordinarily be shown. It is this distinction, I take it, to which the defendants allude in their brief when they speak

in terms of the equitable nature of actions in quasi-contract. And indeed the fact that in entering into the DA–112 transactions on direction of the Department of Agriculture the defendants thereby relinquished their power to achieve substantially the same results by utilization of the concededly valid DA–99 and DA–107 procedures, provides an apparent distinction from the Merrill case. In that case, it was merely held that the claimant had not in fact achieved certain insurance coverage which a government agent had assured him he had. Had the government agent stated the truth, it does not appear that the farmer could have gotten his insurance any place else. See Federal Crop Ins. Corp. v. Merrill, supra, 332 U.S. at page 383, note 1, 68 S.Ct. at page 3.

■■ But the Merrill case does not stand merely for the proposition that one may not rely on the apparent authority of a government agent in order to create a contract or reach the same result through estoppel. It stands also, and perhaps most basically, for the proposition that the burden is on him who deals with the government accurately to discover the scope of statutes and regulations.[7] In Merrill the agent involved did not warrant that he had authority to do a certain thing, but merely interpreted the coverage of a relevant regulation to the farmer. If, then, it must be said that the present law provides that one dealing with the government must not only learn the actual authority of agents but must learn the actual scope of statutes and regulations, it is of no weight that the defendants here claim that they suffered a loss because they incorrectly interpreted a statute. The burden of correct interpretation being upon them, the loss suffered by their misinterpretation must also be upon them, and the money disbursed without authority must be returned to the government.[8]

7. Indeed, on this point, the Merrill case is more appealing than the instant one, in that there the misunderstood provision was a regulation to be found only in the Federal Register. Here, at least, the provision in question was a comparatively available portion of the United States Code.

8. The defendants seek also to distinguish the Merrill case on the grounds that the

■ The fact, however, that the defendants must return the money they received under the DA–112 transactions does not lead to the conclusion that they must also pay interest on that money from the date it was received, or even from the date repayment was demanded. The three Circuit Courts that have previously passed on actions arising out of the DA–112 transactions have uniformly refused to order any pre-judgment interest.[9] The plaintiff argues strongly here that those determinations were erroneous and buttresses its contentions with copious citation. But, its entire argument falls for failing to take account of the basic difference between its claim for ultimate possession of the money disbursed, and its claim for pre-judgment interest on that money.

In regard to interest, the question is not who has the right to ultimate possession of money, but who has the right to possession of the money pending determination of ultimate ownership. In this case, companies dealing with a high official of the government over an extended period of time were directed to utilize a procedure, the invalidity of which could be established only through the most painstaking and extended judicial examination. It has been decided finally that they must return the proceeds of those dealings to the government. But, that decision has been based on a special holding that applies to transactions with the government. In effect,

these defendants have been bound by constructive knowledge of the true scope of 7 U.S.C.A. § 1446, of which they certainly did not have actual knowledge. It would seem only fair and proper that the defendants were not under a duty to repay any money until they reached the point where they knew, or should have known, that they were not entitled to permanent possession. In the circumstances presented by the instant case, that point certainly was not reached when the money was paid, or when the Comptroller General (an agent of the very party seeking return of the money) issued an opinion, or when the adverse party demanded repayment or even when prior and possibly distinguishable cases were decided against other persons in positions similar to that of these defendants. And if there was no known duty to return that disputed money, there should be no duty to pay interest on it.

It should be noted that in the ordinary case of money paid by mistake, when the parties are both private individuals, the same equities that will lead to a determination of the ultimate question of right to the principal will also determine the right to interest on the money withheld. Special equitable considerations as to interest will arise for the most part only in cases such as the present one, where claims of good faith, reasonable reliance, and detrimental change of position are unavailing against a supervening principle of law. But, the fact that

government agent in that case was a minor official, upon whom the claimant should not have relied, while in the instant case DA–112 was promulgated by the Secretary of Agriculture. At least two grounds appear for dismissing that attempted distinction. First, a farmer (the plaintiff in Merrill) would seem to be as justified in believing his local agricultural agent as large companies (like these defendants) employing competent counsel, would be in relying on the Secretary of Agriculture, even if the companies were under the impression that the Secretary himself promulgated every regulation that issued from his department. Second, and more important, the Supreme Court in Merrill made very clear that it

found against the claimant even though his reliance on the government agent was in fact reasonable. " * * * we assume that recovery could be had against a private insurance company." 332 U.S. at page 383, 68 S.Ct. at pages 2, 3, 92 L. Ed. 10. See also 332 U.S. at pages 386–388, 68 S.Ct. at pages 4–5 (dissenting opinion).

9. See cases cited note [3] supra. In the Kraft case the trial court discussed the interest question extensively and awarded interest from the date repayment was demanded. This award was expressly overruled by the Court of Appeals, which denied any pre-judgment interest. See 164 F.Supp. at pages 183–184; 266 F.2d at page 264.

equitable considerations are unavailing in regard to the ultimate question does not mean that they must be ignored in deciding the question of the right to retain money until the ultimate question is decided.

I, therefore, conclude that the defendants must return the disbursements received under the DA–112 transactions challenged in the instant action, with interest at the usual rate from the date of judgment.

Settle order.