**BERNS & KOPPSTEIN, INC., Plaintiff,**

v.

**COMMODITY CREDIT CORPORATION, Defendant.**

**No. 65 Civ. 21.**

United States District Court
S. D. New York.

Jan. 10, 1967.

---

Katz, Wittenberg & Katz, New York City, for plaintiff.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, by David E. Montgomery, Asst. U. S. Atty., for defendant.

## OPINION

TYLER, District Judge.

Berns & Koppstein Inc. ("Berns & Koppstein") brings this action against the Commodity Credit Corporation ("CCC") for moneys due under a contract. The complaint alleges that Berns & Koppstein executed an agreement with CCC in which the former agreed to export butter and CCC agreed in effect to pay it $36,735.55; that Berns & Koppstein has exported the butter as agreed, but that it has been paid only $29,367.92, leaving an unpaid balance of $7,367.63 due and owing from CCC. The answer admits all of the allegations in the complaint, but denies that any money is still owed. As a set-off, CCC alleges that Berns & Koppstein is indebted to CCC for the same amount on contracts other than that alleged in the complaint. Accordingly, the dispute between the parties concerns only the set-off.

The facts are not disputed. On September 23, 1960, the Department of Agriculture published Announcement LD–35 setting forth rules for the submission of offers to purchase dairy products for export from CCC, for the acceptance of such offers, and for the payments for the products so purchased. Part II, Section 1 of the Announcement provided:

"GENERAL: The Terms and Conditions of this Part II of this Announcement shall become a part of the offer as though fully set forth therein."

On five occasions during 1962 and 1963, in response to invitations to bid pursuant to Announcement LD–35, Berns & Koppstein offered to purchase and did purchase quantities of nonfat dry milk in bags from CCC. The offers and ac-

ceptances were all communicated by wire. The dispute concerns the price to be paid.

With respect to price, Part II, Section 2 provided the following:

"PRICE: The price stated in the offer shall be the price announced weekly from Washington, which price will be on the basis of delivery f. a. s. vessel. * * * Such price with respect to all products will be adjusted by CCC to an in store sales price in the following manner:

(1) CCC will deduct from the offered price * * * the following percent of the lowest * * * published export rail freight rate, or if there is no published export rate then the lowest published domestic rail freight rate, per pound, in effect at time of sale for the applicable product and type of packaging, from the in-store location to the port of export having the lowest freight rate from such in-store location:

* * * * * *

| Product | Packing | Percent of freight rate to be deducted |
| --- | --- | --- |
| Notfat Dry Milk | Bags | 102 |

Ports on the Great Lakes shall be considered as ports of export from April 10 to November 15, inclusive * * *."

In each of the five instances, Berns & Koppstein's offering wires stated the proper price but the wrong port of export; further, in each case, CCC's acceptance contained an erroneous adjustment of the offering price. The amount deducted was not computed on the basis of the lowest freight rate, which is conceded to have been the Port of Chicago. Thus, Berns & Koppstein received a greater reduction in the offering price than that specified in Announcement LD–35. For all five contracts, the understatement totalled $5,424.92. In addition, CCC compounded its original error by later determining that on three of the contracts, Berns & Koppstein was entitled to a refund in the amount of $1,-942.71 of part of the price paid. The total "underpayment" amounted to $7,-367.63.

CCC contends that it is entitled to receive the purchase price which, according to the provisions of Announcement LD–35, should have been paid, and that it is not estopped by the erroneous computation in the acceptance wires from collecting the difference. Berns & Koppstein, of course, urges that CCC is bound by the prices stated in the acceptance wires and cannot now recover what should have been the purchase price. It further maintains that even if CCC is correct, it cannot be charged with the difference on three of the contracts, because Chicago was not the proper port for computing the deduction. Both parties have moved for summary judgment pursuant to Rule 56, F.R.Civ.P.

■ The question of whether CCC is entitled to recover the difference between the price actually paid and the price which should have been paid turns on the power of the contracting officers. The documents appointing the two officers who acted for CCC in making the five contracts provided that they were appointed

" * * * contracting officer[s] of Commodity Credit Corporation, with authority to execute, in the name of the Corporation, contracts, agreements or other documents, or any amendments or supplements thereto, *under authorized programs of Commodity Credit Corporation * * *.*" (Italics added.)

Since, by the terms of their appointments, the contracting officers had power to execute contracts only in accordance with authorized programs of CCC—in this case Announcement LD–35, they had no authority to make adjustments other than those specified. Similarly, they had no power to authorize deductions from the offering price on the basis of any port of export other than that which had the lowest freight rate from the in-store location.

■ It may well be that Berns & Koppstein was unaware of the erroneous computation, and I assume for purposes of this discussion that a private contracting party would be bound by the error. But CCC is not a private corporation. It is a branch of the United States Government, and it is well settled that the government cannot be bound or estopped by the unauthorized acts of its agents. Nor can anyone rely on the apparent authority of a government agent in order to create a contract. The burden is on him who deals with the government. United States v. Zenith-Godley Company, 180 F.Supp. 611 (S.D.N.Y. 1960).

"Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority." Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

■ Berns & Koppstein argues that, even assuming that the five contracts could have been disaffirmed because unauthorized, they were subsequently ratified by the government. It cites the completion of performance of the contracts and the erroneous refunds as examples of ratification. It is questionable, however, whether a second error arising out of the original error can be considered a conscious ratification. More important, there was no authority in the contracting agent, or any government agent, to ratify a contract which did not comply with the provisions of Announcement LD–35. Ratification cannot be implied against the government. Berns & Koppstein argues that this principle applies only to acts of the United States in its "sovereign capacity," and not to commercial contracts of a government corporation. The argument is not persuasive;

"It is too late in the day to urge that the Government is just another private litigant, for purposes of charging it with liability, whenever it takes over a business theretofore conducted by private enterprise or engages in competition with private ventures. Government is not partly public or partly private, depending upon the governmental pedigree of the type of a particular activity or the manner in which the Government conducts it." Federal Crop Ins. Corp. v. Merrill, supra at 383–84, 68 S.Ct. at 3.

■ In sum, the principles of estoppel, apparent authority and ratification, which might under similar circumstances bind a private contracting party, cannot be used to bind the government to a contract which, as here, the contracting officer had no power to make. CCC is thus entitled to set off $7,367.63—the difference between the amount actually paid and the amount which, according to the provisions of Announcement LD–35, should have been charged.

■ Berns & Koppstein finally urges that even if CCC is entitled to a set-off, it is not entitled to the entire amount claimed, since Chicago—in three instances—was not a proper port of export. The question turns on a construction of the terms of Announcement LD–35.

As indicated, Announcement LD–35 provided that

"Ports on the Great Lakes shall be considered as ports of export from April 10 to November 15, inclusive * * *."

Berns & Koppstein argues that although all of the sales were completed before November 15, the milk was not, and could not have been, exported until after that date, and thus the Port of Chicago was not a proper "port of export".

I know of no extrinsic evidence, and the parties have cited me to none, which

would aid in the interpretation of this provision. It seems apparent, however, that the interpretation suggested by Berns & Koppstein would be subject to so many uncertainties that it would be virtually unworkable. There would be no definite standard for determining when Chicago was a proper port of export. Section 2(1) (set out at p. 435 supra) states that the deduction is to be made at the time of the sale on the basis of the lowest freight rate in effect at the time of the sale. It would be unreasonable to suppose that the applicability of the disputed provision depended upon another, unknown date.

CCC is thus entitled to the set-off in the amount claimed since Chicago was, in all cases, the proper port of export. Summary judgment is granted in its favor. Settle order and judgment accordingly.