**CONTINENTAL CASUALTY COMPANY, Appellant,**

v.

**The UNITED STATES, Appellee.**

**Appeal No. 85–2650.**

United States Court of Appeals, Federal Circuit.

March 17, 1986.

James A. Dobkin, Arnold & Porter, Washington, D.C., argued for appellant. With him on brief was David P. Gersch, of counsel.

Michael T. Paul, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for appellee. With him on brief were Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director and Thomas W. Petersen, Asst. Director.

Before RICH, DAVIS and NIES, Circuit Judges.

DAVIS, Circuit Judge.

In this action (coming to us from the United States Claims Court) appellant Continental Casualty Company (Continental) challenges the denial by the Small Business Administration (SBA) of Continental's claim for reimbursement with respect to eight surety bond guarantee agreements that the SBA entered into with Continental. On cross-motions for summary judgment, the Claims Court held that the guarantees had been excluded by Congress—because the underlying transaction exceeded $1,000,000—from the SBA's authority to guarantee, and therefore that Continental could not recover. We affirm.

I.

Because this case was decided below on motions for summary judgment, we consider only those facts that are undisputed or indisputable. On November 8, 1979, the City of Los Angeles (City), California, issued a single request for bids for the construction and delivery of ten heavy-duty pumper fire trucks. A few weeks later, on November 23, 1979, the City issued an addendum to the initial bid request advising prospective bidders that it was increasing the quantity of trucks requested from ten to eleven. The award was subsequently made to Seagrave Fire Apparatus, Inc.

(Seagrave). Seagrave's total bid (which covered only ten trucks), including tax, was $1,105,580.[1]

Appellee contends that the City and Seagrave first executed a single contract on March 14, 1980 for eleven trucks and later modified the transaction so that eleven "separate contracts" existed for each of the trucks. We do not decide whether or not this was so.[2] But it is undoubted that, in their entirety, the contracts provided that the City was to make a $828,000 advance payment on the eleven trucks to Seagrave to cover the full price of seven of the trucks purchased under contracts later bonded by appellant and a portion of the eighth truck purchased under a contract also subsequently bonded by Continental. Interest was to run at 14% per annum and would pay for the unpaid balance of the contract price for the eighth truck and a portion of the contract price for the ninth. The balance of the cost of the contract for the ninth truck as well as the contract price for the tenth and eleventh trucks was due on delivery.

On May 2, 1980, Continental issued eight performance bonds (one for each of the first eight contracts or trucks)[3] and in June 1980 Continental executed eight SBA Surety Bond Guarantee Agreements for each of Continental's eight performance bonds. Under the Guarantee Agreements, the SBA underwrote up to 90% of Continental's losses on the eight performance bonds. Continental, as surety, issued the bonds on behalf of Seagrave, as principal, to the City, as obligee.

After Continental issued its bonds, and after the SBA executed its guarantees, FWD Corp., the parent company of Seagrave, filed for bankruptcy. Seagrave thereafter defaulted on all eleven truck contracts with Los Angeles. Seagrave then advised the City that it could construct the eight trucks bonded by Continental only if an additional payment of $828,000 was made. In response, Los Angeles made a demand on Continental for the additional payment pursuant to the performance bonds. Continental made payment to Los Angeles and then sought reimbursement for 90% of its losses from the SBA pursuant to the guarantees.[4]

The SBA refused to pay. The agency denied liability, in part because it "determined that there was one contract in excess of $1,000,000 and, therefore, the SBA had no authority to guarantee any bonds in connection with the contract (Small Business Investment Act, Section 411(e)(2))."[5] Upon reconsideration, the SBA upheld its earlier denial of Continental's claims.

On June 25, 1984, Continental filed suit in the Claims Court for the total amount of the guarantees said to be due it. The only issue before the Claims Court was whether the $1,000,000 contractual limit established by 15 U.S.C. § 694b(e)(2), *supra* n. 5, was exceeded. Granting the Government's mo-

---

1. The record is unclear as to Seagrave's initial failure to respond to the November 23 addendum.

2. The record is plain, however, that each "separate contract" stated that the "complete contract shall consist of THE NOTICE INVITING BIDS" as well as other documents. The bid request issued by the City—as amended—specifically referred to eleven fire trucks. Thus, each of the separate contracts incorporated by reference the subject matter of the other contracts.

3. The contracts for the remaining three trucks were not bonded by Continental and therefore were not subject to the SBA guarantees.

4. Continental's position was that the total of the contracts on which it was surety (and which were bonded) amounted to $828,000—less than one million.

5. Section 694b(e) of title 15, United States Code (which is § 411(e) of the Small Business Investment Act) provides:

   **(e) Reimbursement of surety; conditions**
   Pursuant to any such guarantee or agreement, the Administration shall reimburse the surety, as provided in subsection (c) of this section, except that the Administration shall be relieved of all liability if—
   (1) the surety obtained such guarantee or agreement, or applied for such reimbursement, by fraud or material misrepresentation, or
   (2) *the total contract amount at the time of execution of the bond or bonds exceeds $1,000,000.* (Emphasis added.)

tion for summary judgment, the court declared that the case involved two central issues. First, whether in fact there was one contract or eleven separate contracts. Second, assuming *arguendo* that separate contracts existed, whether these contracts must be aggregated to determine whether the $1,000,000 ceiling imposed by 15 U.S.C. § 694b(e)(2) was exceeded. Both issues were resolved against appellant and in favor of the United States.

## II.

■ On the view we take of this case, there is no disputed factual issue calling for a trial.[6] The case turns wholly on the primary issue of the proper construction of the federal statute (*see supra* n. 5) denying SBA power to guarantee where "the total contract amount" exceeds $1,000,000, and secondarily on the question whether that limit was breached on the undisputed and indisputable facts.[7] We therefore assume *arguendo* Continental's version of the disputable facts, including that (1) separate contracts were made between the City and Seagrave, (2) Continental separately guaranteed those contracts, and (3) the SBA knew (before it made its guarantees) the form and structure of the arrangement. On the basis of those facts, the problem is what is the proper application of the statutory limit.

The SBA is authorized by 15 U.S.C. § 694b(a) to guarantee a surety against loss due to the "breach of the terms of a

... performance bond by a principal on any contract up to $1,000,000."[8] The statute likewise provides that no liability will ensue to the SBA if "the total contract amount at the time of execution of the bond or bonds exceeds $1,000,000." 15 U.S.C. § 694b(e)(2), *supra* n. 5.

It is irrefutable from these provisions that Congress did not want the SBA to guarantee sureties on agreements or transactions of more than $1,000,000, but it is not absolutely plain on the statute's face whether that limit is to be measured by (1) the formal separateness of the individual contracts to be guaranteed, or (2) only the particular contracts (out of an integrated transaction) that are bonded, not by the size of the entire transaction itself, or (3) the size of the whole and entire transaction entered into by one contractor (regardless of the formal separation of that transaction into separate contracts or pieces). We think the third is the correct interpretation.

There is, first of all, textual help from the use (in § 604b(e)(2)) of the term *"total contract amount"* (emphasis added), rather than of the bonded contracts or the total bonded amount or simply the contract's amount. The emphasis seems to be on the total amount of the entire agreement, regardless of how much of it was guaranteed by SBA. Furthermore, the SBA's own publicly promulgated regulation dealing with its authority to grant guarantees, 13 C.F.R. § 115.8(c)1–2 (1981),[9] requires that

---

6. In particular, there is no need to determine whether the City and Seagrave intended separate contracts, or one over-all agreement.

7. It is common ground that, if the statutory $1,000,000 limit was exceeded, the SBA was without authority to make the guarantees, and the guarantees were invalid. Those legal propositions are not contested. *See, e.g., Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

8. Section 694b(a) of title 15, United States Code, provides in part:
 The Administration may, in consultation with the Secretary of Housing and Urban Development and upon such terms and conditions as it may prescribe, guarantee and enter into commitments to guarantee any surety against

loss, as hereinafter provided, as a result of the breach of the terms of a bid bond, payment bond, or performance bond by a principal on any contract up to $1,000,000.

9. 13 C.F.R. § 115.8(c)1–2 (1981) was in effect at the time the SBA executed its guarantee agreements with Continental. These provisions state in part:
 (1) Multiple requests for the guarantees of bonds involving one small business concern on *one project* require the approval of the Regional Director, and/or District Director, as appropriate, when the aggregate amount of these contracts exceeds $250,000 up to $500,000.
 (2) Multiple requests for the guarantee of contract bonds involving one small business concern *on one project* require the approval of

individual contracts entered into with respect to a *single project* (such as the one we have in this instance—essentially one integrated transaction for 11 fire trucks) of a small business concern be aggregated to ascertain the limits of the SBA's approval authority. If the amount is greater than $1,000,000, the public is on notice that no one within the SBA has authority to grant such a guarantee.

We judge, as these significant signs indicate, that the Congressional purpose, in imposing the $1,000,000 limit, was that the SBA should not guarantee an integrated transaction or project by one small business if that transaction or project exceeded the million dollar figure. That was too large a matter for the SBA to deal with by way of guarantee, and thus to expose the public fisc. Congress, in a word, defined the limits of SBA exposure by restricting the size of the projects which the SBA could guarantee to any extent. Congress did not want the SBA to guarantee bonds of small businesses performing contracts in excess of the $1,000,000 limit.

If we were to allow parties to avoid the statutory cap on the underlying transaction (set forth in section 694b) by dividing a single transaction into separate contracts, the Congressional restriction on SBA authority would be drastically diminished or rendered meaningless. Here, for instance, even if there were a series of separate contracts, they all related to one request for bid and the same type of equipment (*see infra* Part III). In addition, because bond-

ing requirements can vary greatly depending upon the circumstances of the particular project, it would make little sense for Congress, if it wanted SBA not to deal at all with large projects, to set a cap based upon the total bonded, as opposed to the total underlying, contract amount. Congress apparently considered that the only reliable indicator for limiting the size of projects on which the SBA could issue bonding guarantees is the total underlying contract amount. Aggregation of the various contracts within the transaction naturally follows.[10]

### III.

■ Regardless of whether there was one formal contract or several between Los Angeles and Seagrave, there is no doubt, on the undisputed and indisputable facts, that the dealings between them were in reality all part of one substantive transaction and one integral project. There was one request for a bid by the City and one response by Seagrave. The separate contracts actually signed by two parties all referred to the other contracts (*see supra* n. 2), and there were other significant indicia that all the contracts rested on a jointly agreed-upon price for all the fire trucks to be bought. There is nothing of any weight to suggest that there were separate projects or transactions. Appellant hardly contends otherwise but simply argues that legally and technically there were separate contracts, or that the statute concerns itself solely with the amount of the contracts

---

the SBA Central Office, when the aggregate amount of these contracts exceeds $500,000 up to $1,000,000 in face value. [Emphasis added.]

On September 9, 1980, the SBA enlarged the approval authority of Regional Administrators so that—concurrent with the Central Office—they could approve surety bond guarantees on contracts not exceeding $1,000,000. 13 C.F.R. § 101.3–2, part III, section C 1 (1981). Previously, the authority to approve surety bond guarantees on contracts between $500,000 and $1,000,000 was vested exclusively with the Central Office.

**10.** Continental alleges that a Federal Acquisition Regulation, 48 C.F.R. § 19.202–1(b) (1984), demonstrates that the Government in certain

circumstances permits one transaction in excess of $1,000,000 to be broken up into separate contracts when it suits the Government's purposes. However, aside from the fact that this regulation was promulgated three years after the SBA executed the guarantee agreements at issue in this case, it is important that the regulation was not promulgated by the SBA, but by the General Services Administration, the Department of Defense, and the National Aeronautics and Space Administration for use by procuring agencies awarding government contracts. Moreover, the regulation specifically pertains to work performed by more than one small business concern—not, as here, by only one such entity carrying on one large project.

under bond and guarantee. We have rejected the latter proposition and have held that the former is irrelevant under the limit the Congress imposed.

AFFIRMED.