No. 18,167.

IRON MUELLER, INC., ET AL. *v.* FEDERAL CROP INSURANCE CORPORATION.

(334 P. [2d] 734)

Decided January 12, 1959. Rehearing denied February 9, 1959.

Messrs. Thomas & Thomas, for plaintiffs in error.

Mr. George Cochran Doub, Assistant Attorney General, U. S. Department of Justice, Mr. Donald E. Kelley, United States Attorney, Mr. Melvin Richter, Mr. John G. Laughlin, U. S. Department of Justice, for defendant in error.

*En Banc.*

Mr. Justice Moore delivered the opinion of the Court.

We will refer to the parties as they appeared in the trial court where plaintiffs in error were plaintiffs and defendant in error was defendant. Two cases in the trial court were consolidated for trial. Since the issues therein were identical we treat them as a single action, and as a single plaintiff in error.

Plaintiff corporation is engaged in wheat farming and defendant's business is the insuring of crops, including wheat, against loss by drought, wind, winter kill, erosion and other causes. It alleges that it suffered a one hundred per cent loss of a wheat crop planted in the fall of 1954 on a large acreage in Cheyenne county, which crop was allegedly covered by an insurance policy issued by

defendant. Defendant admitted issuing the policy of insurance to plaintiff but denied liability thereon on the sole ground that the acreage in question was not "insurable" under the policy.

A jury was empaneled to try the issues and at the conclusion of the evidence submitted by plaintiff, counsel for defendants moved for a directed verdict. This motion was sustained by the trial court and judgment entered in favor of defendant. Plaintiff, seeking review, brings the cause here by writ of error.

The trial court stated the reasons on which it relied for its action as follows:

"THE COURT: The Court is of the opinion that the Plaintiffs have not sustained the burden of proof in this case. The Court recalls the evidence of the last witness for the plaintiff, who operated the land, who, himself, testified that in his opinion the land was not properly summer fallowed within his understanding of the meaning of the term when he planted the crop in 1954; and from the other evidence, the evidence indicates to me, up to this point, that the land had not been summer fallowed. There was some authority cited by the defendant that the Courts can take judicial notice of the meaning of summer fallowing in the agricultural areas, and I have lived in this area for over twenty-five years myself and know something of it, but I am not relying on my knowledge of it. However, the evidence did disclose there was a crop planted on this land in the fall of 1953, and that the crop didn't blow out until February, March and April of 1954. The first summer fallow operation, according to Mr. Brinkhoff, was in April of 1954. The wheat was planted the last of August or first of September of that year; so taking the best possible length of time for the land to have been fallowed, there would have been April, May, June, July and August, five months; that would be using all of August and all of April. I don't think that is the generally accepted meaning of the term 'fallow' to just let the land lie idle for

five months. The common practice is that it be left lie idle for a whole year, in this area, so that it can conserve moisture; not only summer moisture, but so that the land will conserve the moisture in the winter. I think that is the intention of it. So, in view of the fact that the Court is of the opinion that the plaintiffs, having completed their case, have not sustained the burden of proof, the Court will grant the Motion of the Defendant for a directed verdict."

A provision of the policy issued by defendant was as follows:

"2. Insurable acreage. For each crop year of the contract, any acreage is insurable only if a coverage is shown therefor on the county actuarial table on the applicable calendar closing date for filing applications for that crop year, provided the farming practice followed on such acreage is one for which a coverage was established."

Another stipulation in the contract of insurance is as follows:

"4. Insured acreage. The insured acreage with respect to each insurance unit shall be the acreage of wheat seeded for harvest as grain as reported by the insured or as determined by the corporation, whichever the corporation shall elect, except * * *." (Here follows provisions not pertinent to any issue.)

The actuarial table, to which reference is made in provision No. 2 above quoted, was on file in the county office. It contains three instruments, to-wit: (1) A copy of the policy; (2) a map of the insurable area; and (3) a table of premium rates and coverage. The only reference to "summer fallow" appears in said mimeographed actuarial table as follows:

"Form FCI35-W State........*Colorado*........
 Revised 9/29/53 County........*Cheyenne*........
UNITED STATES DEPARTMENT OF AGRICULTURE
 FEDERAL CROP INSURANCE CORPORATION
 *COUNTY ACTUARIAL TABLE*

*......1955......*WHEAT CROP INSURANCE
Fixed Price: $......*1.93*......Per Bushel
Practice......*Summer Fallow (Non Irrigated)"*......

Defendant admits that the table contains no other instruments or information defining "summer fallow." No minimum standards or definition are established by rule or regulation, and it seems to be agreed that what constitutes a good "summer fallow" practice depends upon several variable circumstances — such as soil texture, weather, climatic conditions and other related matters. The agents of defendant, as disclosed by the record, demonstrated this lack of minimum or maximum standards. One witness testified as follows:

"Q. And that definition is what? A. I have stated it two times; I will state it again. The land must be timely tilled in the spring of the year with implements that will keep the — conserve moisture, keep it in cloddy condition and be kept free of weeds until planting time. Q. Now, what if there is no moisture? A. Well, there would be no weeds so it wouldn't need to be worked as many times as if there was moisture."

Another government official asserted by affidavit filed in support of defendant's motion for summary judgment, that:

"The term 'summer fallow' is known to all farmers although due to variations in soil and weather conditions and types of machinery used locally, the methods of following the practice vary in different parts of the country. Farmers, however, invariably know what their local summer-fallow practice is, and I have never heard of a farmer requesting information as to the meaning of the term except in relation to the most elaborate types of summer fallow for which agricultural conservation payments have been made. The agricultural authorities of the various States, including Colorado, issue bulletins in which they specify in detail what constitutes approved summer fallow for their particular States. Those specifications, like the federal agricultural conservation pro-

gram specifications, require more of the farmer than the Corporation does under its contracts of insurance on crops planted on summer fallowed land.

"Therefore, the term 'summer fallow' has not been definite in the wheat crop insurance contracts and instead is used in its commonly accepted meaning, which is that the soil during the year in which the land lies idle shall be worked often enough, beginning at the latest in Colorado around May 15, to keep it free of weeds, which consume moisture, and with instruments which will leave it in a rough and cloddy condition, the number of operations being governed by rainfall as the land must be worked after each substantial fall of rain. The Corporation makes no demands as to the types of machinery used, which may be whatever customarily is used in a locality to achieve the desired result. The Corporation recognizes that a farmer's summer fallowing operations rarely will result in land one hundred percent free of weeds at time of seeding and, therefore, merely requires that no weeds larger than three or four inches tall be allowed to develop and that the land will be clean of weeds to the extent necessary to justify expectation of a good crop from the standpoint of preparation of the soil. If any insured has doubt as to whether or not his summer fallowing operations are sufficient under the contract, he is free to inquire of local representatives of the Corporation who will be glad to inspect his land and advise him."

Other witnesses advanced different ideas as to what was meant by "summer fallow."

Counsel for plaintiff set forth under eleven separate captions the grounds upon which they rely for reversal of the judgment. Reduced to essentials they argue: (1) That when the corporation accepted plaintiff's application for crop insurance, issued its policy, accepted the acreage reports filed by plaintiffs and billed plaintiff for the premium, an enforceable contract existed between the parties under which plaintiff had full cover-

age on the wheat planted on the lands described in the acreage reports; (2) that the "Insured Acreage" provision of the contract, hereinabove quoted, required an election on the part of the company to disapprove the acreage report of plaintiff within a reasonable time after it was filed as a necessary condition to the right to deny liability on the ground that the acreage was not insurable at any time; and (3) that the question as to whether the lands of plaintiff had been "summer fallowed" was one of fact for the determination of the jury.

### Questions to be Determined.

First: *After defendant accepted plaintiff's application for insurance, issued the policy, computed and billed it for the premium, received and accepted the acreage report filed by plaintiff, and to all appearances treated the transaction as one of insurance coverage until after a loss had been sustained and a claim filed; could defendant then assert that the ground seeded to crop was not "insurable acreage" at the time the policy was issued and avoid liability on that ground?*

 This question is answered in the affirmative. The insurance policy in paragraph 2 of the "Terms and Conditions" thereof specifically provides that "any acreage is insurable only if a coverage is shown therefor" on a specific document to be found at a designated place in the county in which the land is located. If in fact the acreage was not insurable at any time, the fact that a policy was issued by defendant under the mistaken belief that the acreage was insurable would not prevent it from denying liability when that fact was established.

The original premise upon which the obligations imposed upon defendant are hinged, is that at the outset the acreage under coverage possesses a status which is "insurable." If this essential ingredient of "insurability" is absent, no liability rests upon the defendant. The opinion of the Supreme Court of the United States in *Federal Crop Insurance Corp. v. Merrill, et al.*, 332 U. S. 380, was

a case in which a policy was issued on acreage which was not insurable for the reason that 400 acres of spring wheat was reseeded on winter wheat acreage. In that case evidence was permitted to go to the jury to the effect that the insured had no actual knowledge of the company's regulations in so far as they precluded insurance for reseeded wheat. Evidence was also presented to prove that the policy holder had in fact been misled by the company's agents into believing that spring wheat reseeded on winter wheat acreage was insurable by the corporation. The state court gave judgment for the claimant. We quote from the opinion of the Supreme Court of the United States, which reversed the state court, as follows:

"If the Federal Crop Insurance Act had by explicit language prohibited the insurance of spring wheat which is reseeded on winter wheat acreage, the ignorance of such a restriction, either by the respondents or the Corporation's agent, would be immaterial and recovery could not be had against the Corporation for loss of such reseeded wheat. Congress could hardly define the multitudinous details appropriate for the business of crop insurance when the Government entered it. Inevitably 'the terms and conditions' upon which valid governmental insurance can be had must be defined by the agency acting for the Government. And so Congress has legislated in this instance, as in modern regulatory enactments it so often does, by conferring the rule-making power upon the agency created for carrying out its policy. See §516 (b), 52 Stat. 72, 77, 7 U.S.C. §1516 (b). Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents. 49 Stat. 502, 44 U.S.C. §307.

"Accordingly, the Wheat Crop Insurance Regulations were binding on all who sought to come within the Federal Crop Insurance Act, regardless of actual knowledge

of what is in the Regulations or of the hardship resulting from innocent ignorance."

In the case at bar there is no question as to whether the parties had knowledge of the existence of the actuarial table which controlled the "insurability" of the acreage. Plaintiff knew of its existence and knew where it could be examined.

Second: *Does that provision of the contract which provides that the "insured acreage * * * shall be the acreage of wheat seeded, * * * as reported by the insured, or as determined by the corporation, whichever the corporation shall elect * * *," require any election on the part of defendant to disapprove the acreage report after it is filed before it can be heard to deny liability on the ground that the acreage was not insurable at any time?*

█ This question is answered in the negative. The provision of the policy referred to in the above question has no connection with the insurability of any acreage. It relates to the description and total number of acres involved rather than to the status of the ground as being insurable. It assumes insurability, and if the assumption is without basis in fact defendant is free to establish lack of insurability, notwithstanding it did not exercise its election to modify the acreage report filed by plaintiff.

Third: *Did the trial court err in determining that plaintiff could not recover upon the policy for the reason that as a matter of law his acreage was not insurable because of failure to "summer fallow" the ground?*

This question is answered in the affirmative. The deposition of Mr. Mueller described at least one farmer's conception of what the expression "summer fallow" implied: He described it as land "worked through the summer to get it ready for wheat, — planting wheat and get the soil conditions so it don't blow out on you or blow away. The purpose of summer fallowing is to plant wheat. When there isn't any moisture it doesn't make any difference how you do it. When the ground is dry, the rougher the better, cloddy and a few weeds on it. A

few weeds don't hurt. In fallowing practices the P.M.A. has said that a few weeds don't hurt. The main thing is to get your weeds up and hold the soil. That depends on the country." "Here is the way it is: If you have a weed just now and then, O.K. The snow off of these bare spots will catch that weed and that's where the wheat is the best right around that weed. A few weeds don't hurt, because the snow off of the bare ground will stay in the weed." Mr. Meuller also testified that this acreage was summer fallowed, and told specifically the work that was done and the machinery that was used, all of which he considered appropriate and essential to prepare the soil for planting in the face of the drastic climatic and soil conditions which existed during the summer of 1954.

■ Admittedly the defendant has established no minimum requirements as to what is an acceptable summer fallow within the terms and conditions of its crop insurance policy. No government agent saw the acreage until long after the crop had been blown away by the wind. No inspection of the land was made by defendant's agents until the last part of January 1955 — five months after the ground had been seeded.

There is no dispute in the evidence as to whether the acreage was worked from April through September. There is no showing that the use of the equipment in performing the work was in any manner improper. There is no question of fraud involved and there is nothing to indicate that plaintiff and its agents did anything other than put forth a bona fide effort to efficiently prepare the acreage throughout the summer for fall planting of wheat, and to use such methods as long experience prompted it to follow in the hope and expectation of harvesting a crop.

The evidence considered in the light most favorable to plaintiff established a prima facie case and it was error to direct a verdict for the defendant. The judgment is reversed and the cause remanded for a new trial to be conducted consistent with the views herein expressed.