**MIDWEST SPORTS MEDICINE AND ORTHOPEDIC SURGERY, INC., Pension Plan Trust, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. C–3–95–443.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 9, 1999.

Robert Perry Bartlett, Jr., Coolidge Wall Womsley & Lombard, Dayton, OH, Terence Leslie Fague, John Alan Cumming, Lance A Gildner, Coolidge Wall Womsley & Lomb, Dayton, OH, for Midwest Sports Medicine and Orthopedic Surgery, Inc., Pension Plan Trust, plaintiff.

Carina J. Campobasso, U.S. Department of Justice, Tax Division, Washington, DC, for United States of America, defendant.

DECISION AND ENTRY OVERRULING PLAINTIFF'S MOTION TO JOIN ADDITIONAL PARTIES (DOC. # 34) AND ITS MOTION TO ENFORCE SETTLEMENT AGREEMENT (DOC. # 29); CONFERENCE CALL SET

RICE, Chief Judge.

The Plaintiff, Midwest Sports Medicine and Orthopedic Surgery, Inc., Pension Plan Trust ("Midwest Pension Plan") initiated this litigation against the United States of America ("United States"), pursuant to 26 U.S.C. § 7426, for wrongful levy of property belonging to a person other than the taxpayer (Doc. # 1). Specifically, Midwest Pension Plan alleged that the United States wrongfully seized its property, held by Smith Barney, Inc., as the property of Midwest Sports Medicine and Orthopedic Surgery, Inc. ("Midwest"), and of William H. and Anne E. Donahue ("the Donahues").[1] (*Id.*) On July 2, 1997, Midwest Pension Plan filed a Second Amended Complaint (Doc. # 16), which claimed that the property wrongfully seized also included additional investments held by Bank One Dayton, N.A.

Pending before the Court is Plaintiff's Motion to Enforce Settlement Agreement (Doc. # 29) and its Motion to Join Additional Parties (Doc. # 34). For the reasons assigned, Plaintiff's Motions are OVERRULED.

I. *Background*[2]

The claims asserted by Midwest Pension Plan against the United States have largely been resolved.[3] *See* Mem. of United States in Opp. to Joinder of Add'l Parties (Doc. # 23 at 1–2) ("The United States has already conceded that its levy of the Smith–Barney accounts belonging to the plaintiff was wrongful and has agreed to refund those assets. It does not now contend that the funds from the Pension Plan accounts belong to anyone but the Pension Plan. There is no longer any justiciable controversy.")[4] At this juncture, however,

---

1. A First Amended Complaint (Doc. # 2), containing minor modifications, was filed on January 26, 1996.

2. The following undisputed facts are derived from the evidence submitted by the parties regarding Plaintiff's Motions to Join Additional Parties (Doc. # 34) and to Enforce Settlement Agreement (Doc. # 29). A more detailed chronology of the negotiations between the parties is set forth *infra*, p. 13–18.

3. The United States has not stated whether it has conceded that the levy on Midwest Pension Plan's assets, held by Bank One Dayton, N.A., was wrongful, as well. The Court will assume, until it is advised to the contrary, that the government's general statement that no justiciable controversy exists also covers the Bank One matter. Parenthetically, the Court notes that the Smith–Barney account represents the lion share of the disputed monies ($561,317.35 in Smith–Barney account versus $69,099.54 in the Bank One account) (Doc. # 16 ¶ 8).

4. *See also* Correspondence, dated November 28, 1997, from D. Partick Mullarkey, Chief, Civil Trial Section, Northern Region, to this Court regarding the status conference scheduled for December 3, 1997 (Doc. # 29, Ex. B) ("With regard to your request on the United States' settlement position in this matter, as counsel for the plaintiff knows, the United States conceded well over a year ago in June of 1996 that the levies issued on the plaintiff's bank accounts at Smith–Barney, which were the subject of the plaintiff's original complaint, were wrongful and agreed to return the amounts so levied.").

the seized funds remain with the United States.

Rather than return the seized funds and settle this litigation thereby, the parties have sought to enter into a "global settlement", whereby they would resolve, in one agreement, this litigation and the dispute between the Internal Revenue Service ("IRS") and the Donahues regarding their federal tax liability. It is the pursuit of this global settlement that has caused this litigation to continue for nearly four years.

At numerous times during the course of this litigation, the parties have represented that they were close to reaching a settlement. The Court has held a number of status conferences and has offered its assistance to the parties in their pursuant of an agreement (Doc. #11, #21, #25, #28). Consistently, Plaintiff has eagerly sought the Court's aide in reaching and enforcing a settlement. Equally consistently, the United States has contested the Court's jurisdiction to involve itself in the pursuit of a settlement between the United States and the Donahues regarding payment of their tax liability, an issue which is not part of this litigation, but is a part of the sought-after global settlement.

## II. *Motion to Join Additional Parties (Doc. #34)*

The issue of joinder of the Donahues as parties to this litigation was raised during the status conference held on December 16, 1997. At that time, the Court requested that the parties submit memoranda addressing that concern. The parties complied with that request, with Plaintiff filing its memorandum (Doc. #22) on December 30, 1997, and the United States filing an Opposition Memorandum (Doc. #23) on January 8, 1998. In bringing its Motion to Join Additional Parties (Doc. #34), Midwest Pension Plan incorporates its previous memorandum on that issue. The Memorandum of the United States in Opposition to Plaintiff's Motion to Join Additional Parties (Doc. #35) similarly incorporates its previous memorandum.

Plaintiff asserts that numerous avenues exists for properly joining the Donahues as parties to its lawsuit, to wit: (1) an amended complaint, pursuant to Fed.R.Civ.P. 15, whereby the Donahues would be added as party-plaintiffs to a claim for declaratory judgment; (2) intervention as of right, pursuant to Fed.R.Civ.P. 24(a)(2); and (3) permissive intervention, pursuant to Fed. R.Civ.P. 24(b). As discussed below, the Court concludes that joinder is not appropriate.

### A. *Intervention Pursuant to Fed. R.Civ.P. 24*

Plaintiff asserts that joinder of the Donahues may be accomplished by intervention as of right or by permissive intervention. Rule 24(a)(2) permits intervention as of right:

> when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a)(2). Rule 24(b), addressing permissive intervention, gives the court discretion to allow intervention "when the applicant's claim or defense and the main action have a question of law or fact in common."

The procedure for seeking intervention is set forth in Rule 24(c). It states, in pertinent part, "A person desiring to intervene shall serve a motion to intervene upon the parties as provided in Rule 5. The motion shall state the grounds therefor and shall be accompanied by a pleading setting forth the claim or defense for which intervention is sought." Because Rule 24 requires that the person seeking to be joined as a party file a motion for intervention, that Rule does not constitute a means by which Midwest Pension Plan, already a party to the litigation, may seek joinder of the Donahues, a third-party. It is the Donahues, the party seeking to join

this litigation, who must file a Rule 24 motion to intervene. Although Midwest Pension Plan desires the Donahues to be joined as parties, there is no evidence before the Court that the Donahues have served a motion to intervene upon the parties. No motion for intervention has been filed by them with the Court. Accordingly, a motion for the Donahues to intervene in the present litigation has not been properly raised.

### B. *Amended Complaint Pursuant to Fed.R.Civ.P. 15*

■ Midwest Pension Plan seeks to file an amended complaint, adding a claim for declaratory judgment as to extent of the Donahues interest in the property seized by the United States.[5] Leave to file an amended complaint "shall be freely given when justice requires." Fed.R.Civ.P. 15(a); *Foman v. Davis,* 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Two factors that must be considered in determining whether to grant such leave are whether the amendment would be prejudicial to the other side and whether the amendment would be a futile gesture.

Plaintiff argues that it is necessary to ascertain its right to the seized assets vis-a-vis the interests of the Donahues and Midwest so as to prevent it from being exposed to double or multiple liability.[6] It states that the government contends that some portion of the seized assets belongs to Midwest and that the remainder belongs to the Donahues, and that the respective portions were used to satisfied Midwest's and the Donahues' tax liabilities.

Plaintiff asserts that, if the government's contention is incorrect with respect to the ownership interests of Midwest and the Donahues, it will have no immunity from liability to Midwest or the Donahues as to the misapportioned property. This lack of immunity, Plaintiff argues, renders it vulnerable to multiple liability and makes it necessary for the Court to resolve the question of its property interest in the pension fund as well as the interests of Midwest and the Donahues.

In response, the United States asserts that Plaintiff's basis for multiple liability is based upon a false premise, namely that the United States contends that some portion of the pension funds belong to Midwest and the Donahues. To the contrary, the government states that it "has already conceded that its levy of the Smith–Barney accounts belonging to the plaintiff was wrongful and has agreed to refund those assets. It does not now contend that the funds from the Pension Plan accounts belong to anyone but the Pension Plan." (Doc. # 23 at 1–2)

■ Midwest Pension Plan's concerns regarding its potential liability to Midwest and Donahue, based on its compliance with the government's levy, has been addressed by statute. 26 U.S.C. § 6332(e), titled "Effect of honoring levy," provides:

> Any person in possession of (or obligated with respect to) property or rights to property subject to levy upon which a levy has been made who, upon demand by the Secretary, surrenders such property or rights to property (or discharges such obligation) to the Secretary (or who

---

5. In its Motion, Plaintiff requests that the Donahues be added as parties-plaintiff. However, Plaintiff asserts that it could face potential lawsuits from Midwest and the Donahues if the government is incorrect about its assumptions regarding their ownership interests in the seized pension plan assets. Accordingly, it appears that joinder of the Donahues as a parties-defendant would be more appropriate.

6. Midwest Pension Plan states that, "if the Pension Plan still held the seized assets, it could file an interpleader action naming the

United States as well as the Donahues and Midwest as defendants in order to protect itself from competing claims to the assets and potential double liability." (Doc. # 22 at 3) Because Plaintiff has acknowledged that it can no longer bring an interpleader action, due to the fact that it is no longer the stakeholder (the levied funds are now in the hands of the government), the Court will not address joinder of the Donahues, pursuant to Rule 22 (rule interpleader) or the Federal Interpleader Act, 28 U.S.C. §§ 1335, 1397, 2361 (statutory interpleader).

pays a liability under subsection (d)(1)) shall be discharged from any obligation or liability to the delinquent taxpayer and any other person with respect to such property or rights to property arising from such surrender or payment.

Immunity under § 6332(e) has been interpreted generously, *Farr v. United States,* 990 F.2d 451, 456 (9th Cir.1993), and courts have held it applies regardless of whether the underlying levy is valid, *see Moore v. General Motors Pension Plans,* 91 F.3d 848, 851 (7th Cir.1996). Thus, pursuant to section 6332(e), Midwest Pension Plan would be immune from liability to Midwest and the Donahues for complying with the IRS levy.

■ In arguing that it might be subject to competing claims and potential double liability, Midwest Pension Plan cites to *Toledo Plumbers & Pipefitters Plan and Trust v. United States,* 1991 WL 172932 (N.D.Ohio. June 21, 1991). In that case, a retirement plan brought an interpleader action, with the United States and the taxpayer as defendants, after the IRS had issued a levy against funds held by the plan for the benefit of the taxpayer and his spouse. Relying on *Johnson v. United States,* 566 F.Supp. 1012 (M.D.Fla.1983) and 26 C.F.R. § 301.6332–1(c), which did not state that the person who complied with the levy was immune from liability to non-taxpayers, the court concluded that the immunity in 26 U.S.C. § 6332 did not extend to a person who mistakenly surrenders the property of a third party who is not subject to an IRS levy. Because the

taxpayer's wife therein was not subject to an IRS levy, the court concluded that § 6332(e) did not apply and, therefore, the retirement plan could be subject to double liability if it honored the IRS levy. The court, therefore, held that the interpleader action was proper.

■ This Court finds *Toledo Plumbers* to be incorrect and unpersuasive. *First,* the plain language of the statute specifically states that compliance with an IRS levy discharges that person or entity "from any obligation or liability to the delinquent taxpayer *and any other person* with respect to such property or rights to property arising from such surrender or payment." 26 U.S.C. § 6332(e) (emphasis added). Thus, on its face, § 6332(e) is applicable to Midwest Pension Plan, and it provides immunity to that Plan from liability to both Midwest and the Donahues. In addition, the *Johnson* decision, upon which *Toledo Plumbers* relies, construes an earlier version of § 6332(e), which did not contain the phrase "any other person." [7] *Ollerdessen v. United States,* 1993 WL 313159 (N.D.Cal. Aug.9, 1993) (disregarding *Johnson* because it construed an earlier version of § 6332(e), and dismissing claim of third-party against the partnership who honored an IRS levy over his lien). In light of the fact that Congress amended § 6332 to include the phrase "any other person" in its grant of immunity, the Court concludes that § 6332(e) extends immunity to a person or entity who mistakenly surrenders the property of a third party, who is not subject to an IRS levy.[8]

---

**7.** The phrase "and any other person" was added to the statute in 1988. Technical and Miscellaneous Revenue Act of 1988, Pub.L. 100–647 § 4045(t)(1), 102 Stat. 334; *see Ollerdessen,* 1993 WL 313159.

**8.** The current regulations acknowledge the 1988 amendment to § 6332(e). 26 C.F.R. § 301.6332–1(c)(1). With regard to the surrendering of property of a third-party based on an IRS levy, the regulations state:

Any person who surrenders to the Internal Revenue Service property or rights to property not properly subject to levy in which the delinquent taxpayer has no apparent interest is not relieved of liability to a third

party who has an interest in the property. However, if the delinquent taxpayer has an apparent interest in property or rights to property, a person who makes a good faith determination that such property or rights to property in his or her possession has been levied upon by the Internal Revenue Service and who surrenders the property to the United States in response to the levy is relieved of liability to a third party who has an interest in the property or rights to property, even if it is subsequently determined that the property was not properly subject to levy.

*Id.* § 301.6332–1(c)(2). The regulation makes clear that so long as that taxpayer *appears* to

Because this Court concludes that Midwest Pension Plan would not be subject to suit, pursuant to 26 U.S.C. § 6332(e), due to good faith compliance with the IRS levy, Midwest Pension Plan's fear of double or multiple liability from the Donahues or Midwest Sports Medicine and Orthopedic Surgery, Inc., is unfounded. Accordingly, the Court sees no purpose for a claim for declaratory judgment to resolve the question of its property interest in the pension fund, vis-a-vis the interests of Midwest and the Donahues in that fund. Plaintiff's Motion to join the Donahues as additional parties, by means of a further amended complaint, is OVERRULED.[9]

### C. *Joinder of Persons Needed for Just Adjudication, Fed.R.Civ.P. 19*

■ Although not raised by Plaintiff, the Court may order persons to be added to the litigation if those individuals constitute persons necessary for just adjudication. Fed.R.Civ.P. 19. Rule 19(a) provides, in pertinent part:

A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a sub-

stantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

Fed.R.Civ.P. 19(a). In the present action, Midwest Pension Plan claims that the United States wrongfully seized its property as the property of Midwest and the Donahues. The Court sees no reason why that claim cannot be resolved completely among the current parties. Indeed, it appears that the parties have, in fact, so resolved it. Accordingly, Midwest and the Donahues are not indispensable parties under Rule 19(a)(1).

To the extent that the Donahues have an interest in the pension fund, the Court sees no any reason why their absence from the litigation would, as a practical matter, impair or impede their ability to protect that interest. By seeking the return of those funds from the government, Plaintiff appears to be fully protecting those interests.[10] Furthermore, as discussed, *supra*, at 874–75, the Donahues absence from the litigation would not subject Midwest Pension Plan to a substantial risk of double or multiple obligations. Thus, the Donahues and Midwest are not indispensable parties, pursuant to Rule 19(a)(2). Accordingly, the Court concludes that the Donahues do not constitute parties necessary for just adjudication. Plaintiff's Motion to Join Additional Parties (Doc. # 34) is OVERRULED.

### III. *Motion to Enforce Settlement Agreement (Doc. # 29)*

Plaintiff has filed a Motion to enforce a settlement that was allegedly entered into

---

have *any* interest in the property, the person who complies with the levy is immune from liability to both the taxpayer *and* third-parties. *Id.* § 6332–1(c)(4). Thus, so long as Midwest and the Donahues even appear to have a modicum of interest in the pension funds, as asserted by the IRS, the immunity set forth in § 6332(e) would be applicable. *See id.; Schulze v. Legg Mason Wood Walker, Inc.*, 865 F.Supp. 277, 278 (W.D.Pa.1994) (even if others claim an interest in the property and the taxpayer's interest may be quantified as but a modicum, the property remains subject to attachment by levy and § 6332(e) would apply).

9. The Court notes that Plaintiff has failed to provide the Court with the proposed Third Amended Complaint.

10. Although the government has not yet returned the money to the pension plan, the Court finds it doubtful that the taxpayers, who are beneficiaries of the plan, would be more successful in obtaining the return of the money, in light of the fact that it is their assets which the IRS is attempting to seize.

by the parties on October 2, 1998. It asserts that, on that date, counsel for both parties represented to the Court that a settlement had been agreed to and that the parties needed to resolve three remaining issues prior to implementing that settlement (Doc. # 29 at 1). Plaintiff argues that the terms to which the parties had not agreed were not central to the dispute between the government, Midwest Pension Plan, and the Donahues. It contends that the omission of those terms does not render the alleged settlement agreement invalid. Plaintiff further argues that this Court has the power to enforce the alleged settlement and that it should do so. Plaintiff's evidence of the existence of a settlement agreement consists largely of numerous items of correspondence between Mr. Mullarkey; Ms. Campobasso, Trial Attorney, Civil Trial Section, Department of Justice; Mr. Cumming, co-counsel for Plaintiff; and Mr. Gildner, co-counsel for Plaintiff.[11]

The United States has responded that the correspondence submitted by Plaintiff indicates that no settlement was reached between the parties. It further argues that, even if such correspondence could be interpreted to represent the acceptance of an offer of settlement on behalf of the Donahues and Midwest, Mr. Mullarkey did not have the authority to make such a settlement. Because Mr. Mullarkey did not have settlement authority, Defendant argues, the United States cannot be bound by his acceptance of any offer of settlement.

11. The United States implies that counsel for Plaintiff also represents the Donahues and Midwest. Although Plaintiff does not explicitly acknowledge the truth of the government's statement, a reading of the correspondence submitted by Plaintiff strongly suggests that this is the case.

12. As noted above, the United States has not stated whether it has conceded that the levy on Midwest Pension Plan's assets, held by Bank One Dayton, N.A., was wrongful, as well.

### A. *History of Settlement Negotiations*

In June of 1996, the United States conceded that the levies on Midwest Pension Plan's bank accounts at Smith–Barney were wrongful and agreed to return the funds (Doc. # 29, Ex. B).[12] However, the case was not terminated at that time. Rather, the parties agreed to pursue a "global settlement," which would include a compromise of the outstanding tax liabilities of the Donahues, in part by having the United States keep the wrongfully levied amounts to apply to those liabilities (*see id.*).

Ms. Campobasso mailed a sample collateral agreement to Plaintiff's counsel on July 18, 1997 (*Doc.* # 29, Ex. C). Following Plaintiff's receipt of said agreement, counsel agreed, subject to the approval of Ms. Campobasso's superior at the Department of Justice, to accept the collateral agreement as the instrument of settlement (Doc. # 29, Gildner Aff. ¶ 4). On August 17, 1997, the parties informed the Court that a settlement had been reached, excluding the claim added by Plaintiff's Second Amended Complaint (Doc. # 29, Ex. D). Three months later, Ms. Campobasso indicated to Mr. Gildner that her superior had rejected the settlement agreement (Gildner Aff. ¶ 5). On December 9, 1997, Mr. Mullarkey sent correspondence to this Court, indicating that no settlement had been reached. That letter also indicated that any settlement offer would have to be in writing, approved by him and the IRS. He further indicated that the Review Section of the Tax Division would also have to approve any settlement under which the United States gave up more than $300,000 of liability.[13]

13. The United States attaches a copy of this correspondence (Ex. 5), along with correspondence to Mr. Gildner, dated December 9, 1997 (Ex. 4); correspondence to the Court, dated December 16, 1997 (Ex. 6); correspondence to Mr. Cumming, dated January 7, 1998 (Ex. 7). None of the aforementioned correspondence has been authenticated. Accordingly, they are not proper evidence before the Court, and they will not be considered. The Court notes, however, that even if it were to allow the government the opportunity to authenticate its exhibits and to reconsider Plaintiff's Motion to Enforce Settlement with

On April 1, 1998, Mr. Mullarkey sent correspondence to Mr. Gildner, stating that the IRS had authorized the Department of Justice to settle all tax liabilities of the Donahues and Midwest, and setting forth four conditions that had to be met before a settlement could be reached (Doc. # 29, Ex. E).[14] On May 4, 1998, Mr. Gildner responded to the April 1, 1998, letter, by means of correspondence to Ms. Campobasso, in which he agreed to the overall structure of the settlement and to two of the four conditions (Doc. # 29, Ex. F).[15] On the same date, Mr. Gildner and Ms. Campobasso again discussed, via telephone, the settlement of this case (id. ¶ 8). Ms. Campobasso requested updated Social Security statements for the Donahues, completed Forms 433A and 433B, current balances of all remaining Plan accounts, and an estimate of the fair market value of remaining Plan assets (id.)

On September 28, 1998, Mr. Gildner sent correspondence to Ms. Campobasso, providing her with the updated Social Security estimated benefits statements for the Donahues, updated values of the Midwest Pension Plan's assets, and the IRS allowances, as reported on the most recent Form 433A (Doc. # 29, Ex. G). The correspondence also confirmed the settlement that the parties had allegedly reached, including terms that the allowable monthly expenses figure was $15,033, that the forfeited proceeds would be applied first towards the Donahues' 1997 tax liability and Plaintiff's reasonable attorney fees. Mr. Gildner proposed one change regarding the required monthly payment by the Donahues. He indicated that, once the IRS approved the most recent financial statement, all that remained was the preparation of the final calculations. He further stated that he understood that the amount of attorney fees was the only issue under consideration by the IRS with respect to the most recent financial statement.

Mr. Mullarkey responded to Mr. Gildner's correspondence of September 28, 1998, on October 2, 1998 (Doc. # 29, Ex. H). In his reply, Mr. Mullarkey addressed six items of the alleged settlement. First, he indicated that the allowable monthly expense figure, as calculated by the IRS, was $3,333.00 rather than $15,033. Second, he accepted the modification to the second condition, which Mr. Gildner had proposed in his letter of May 4, 1998. Third, he contested Mr. Gildner's representation that the parties had agreed that the forfeited proceeds would be applied first towards the Donahue's 1997 tax liability. Fourth, he addressed the calculation of the 60 monthly payments. Fifth, he stated that the discount rate applied by Plaintiff's counsel was incorrect. Finally, he disputed that attorney fees were included in the proposed settlement.

After receiving the correspondence from Mr. Mullarkey, Mr. Cumming and Mr. Gildner discussed the letter, on October 2, 1998, via telephone, with Ms. Campobasso (Doc. # 29, Cumming Aff. ¶ 3). During

that evidence, the Court's analysis would not be different.

14. The conditions set forth in the correspondence were: (1) that the Donahues actually purchase an annuity with the amount determined and may not avail themselves of a cash option with respect to this annuity; (2) that the Donahues enter into a collateral agreement under which all net-of-tax amounts earned by them over and above the annual allowance described above shall be paid to the IRS for five years from the effective date of the agreement; (3) that the IRS may levy on any assets it discovers that are owned by the Donahues or Midwest that were not disclosed on the financial disclosure forms that they have submitted to the IRS; and (4) that the Donahues and Midwest, before any settlement is finalized, file their 1997 federal income tax returns.

15. Mr. Gildner's acceptance was to the third and fourth conditions. With regard to the second condition, he proposed that the condition be modified to require an upfront lump sum payment taken from the funds that the Donahues are allowed to keep for the proposed purchased of the annuity. As for the first condition, he proposed that the Donahues create a new qualified pension plan and that their remaining balance be rolled over by the trustee of the current plan to the trustee of the new plan.

that conversation, according to Mr. Cumming, Ms. Campobasso agreed that the forfeited proceeds would not be applied towards the Donahues' 1997 federal income tax liability (*id.* ¶ 4; Gildner Aff. ¶ 13). Counsel did not agree as to the current IRS discount rate, the amount of estimated IRS monthly expenses which would be allowable to the Donahues, or whether reasonable attorney fees would be covered in the settlement (Cumming Aff. ¶ 4; Gildner Aff. ¶ 13).

At approximately 5:00 p.m. on that same date, the parties had a telephone conference call with this Court regarding the status of the settlement negotiations. According to Plaintiff, at that time, there were three issues remaining to be resolved, to wit: (1) the amount of attorney fees to be paid to Plaintiff, (2) the amount of monthly expenses to be allowed to the Donahues, and (3) the discount rate to be used to calculate present value (*see* Doc. # 26).

On October 6, 1998, Mr. Gildner received correspondence from Ms. Janice Widemann of the IRS, setting forth, based on the anticipated settlement between the IRS and the Donahues, the installment amounts due from the Donahues, effective November 5, 1998, and December 5, 1998 (Doc. # 29, Ex. J). The correspondence further indicated that the Donahues' $20,-000 arrearage would be due by December 31, 1998 (*id.*).

On December 23, 1998, Mr. Gilder received a letter from Mr. Milan D. Karlan, Chief, Office of Review, setting forth the terms of settlement that the attorneys in the Civil Trial Section, the IRS, and the Office of Review are prepared to recommend for acceptance. Those terms differed in a number of respects from those discussed in October of 1998. Accordingly, on December 29, 1998, Plaintiff filed its Motion to Enforce the Settlement Agreement reached on October 2, 1998 (Doc. # 29).

## B. *Analysis*

The memoranda of the parties raise three issues with regard to Plaintiff's Motion to Enforce Settlement Agreement (Doc. # 29). *First,* the parties raise the extent of the Court's jurisdiction to enforce the alleged agreement, in light of the fact that it involves a non-party to this litigation, namely the Donahues. Plaintiff argues that the Donahues' participation in the settlement does not affect the Court's ability to enforce the agreement *in toto.* On the other hand, the United States has consistently asserted that this Court has no jurisdiction over the settlement of the Donahues' federal tax liability but, rather, is limited to the issue of the wrongfully seized pension plan assets. *Second,* the parties dispute whether Mr. Mullarkey, the representative of the United States with whom Plaintiff allegedly reached a settlement, had the authority to make such an agreement. *Third,* the parties hotly contest whether a settlement had, in fact, been reached. Because the Court concludes that Mr. Mullarkey did not have the actual authority to enter into the alleged settlement, the first and third issues need not be addressed.

■ "An agreement to settle a lawsuit, voluntarily entered into, is binding upon the parties, whether or not made in the presence of the court, and even in the absence of a writing." *Green v. John H. Lewis & Co.,* 436 F.2d 389, 390 (3d Cir. 1970). A party to a settlement agreement may seek to enforce the agreement's terms when the other party reneges. If, at the time of the claimed breach, the court case already has been dismissed, the aggrieved party may bring an independent action for breach of contract. *See Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 381–82, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). If, however, the settlement collapses before the original suit is dismissed, the party who seeks to keep the settlement intact may file a motion for enforcement. *Malave v. Carney Hosp.,* 170 F.3d 217, 220 (1st Cir.1999); *see United States v. Hard-*

*age,* 982 F.2d 1491, 1496 (10th Cir.1993) ("A trial court has the power to summarily enforce a settlement agreement entered into by the litigants while the litigation is pending before it.") (citations omitted).

The correspondence of October 2, 1998, which Plaintiff asserts memorializes the settlement reached by the parties, contains the following the signature line: [16]

LORETTA C. ARGRETT

Assistant Attorney General

Tax Division

By:

D. PATRICK MULLARKEY

Chief, Civil Trial Section

Northern Region

The correspondence was signed by Mr. Mullarkey.

The United States asserts that Mr. Mullarkey lacks the legal authority to bind the United States to the settlement that was allegedly reached with the Plaintiff (Doc. # 36). It further argues that a party dealing with an agent of the United States is held to the know the scope of that agent's authority. Moreover, it asserts that, via correspondence dated December 9, 1997, and December 16, 1997, Plaintiff was informed that the Tax Division's Review Section would have to approve any settlement under which the United States gave up more than $300,000 of liability.[17]

In response (Doc. # 37), Plaintiff disputes the government's assertion that it was informed of the need for review by the Tax Division's Review Section. It argues that the cited correspondence relates to the first attempted settlement in 1997, and that those documents indicated only that any settlement recommended *by Ms. Campobasso* would be subject to review. Mid-

west Pension Plan argues that the correspondence leading up to the settlement at issue came from Assistant Attorney General Argrett, who has the authority to settle matters up to $2,000,000.

It is well-established that the United States can be bound only by officials acting within the actual scope of their legal authority. *Utah Power & Light v. United States,* 243 U.S. 389, 409, 37 S.Ct. 387, 61 L.Ed. 791 (1917); *United States v. Jones & Laughlin Steel Corp.,* 804 F.2d 348, 352 (6th Cir.1986) ("The United States is not bound by the unauthorized acts of its agents.")

Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power.

*Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 383, 68 S.Ct. 1, 92 L.Ed. 10 (1947).

Pursuant to 28 C.F.R. § 0.160(a), Assistant Attorneys General are authorized to compromise claims of the United States in all cases in which: (1) the difference between the gross amount of the original claim and the proposed settlement does not exceed $2,000,000 or fifteen percent of the original claim, whichever is greater; (2) the principal amount of the proposed settlement does not exceed $2,000,000; and (3) nonmonetary cases. The Assistant Attorney General may delegate that authority to subordinate division officials and United States Attorneys.[18] *Id.* § 0.168.

---

16. The additional correspondence from Mr. Mullarkey submitted by Plaintiff (Doc. # 29, Exs. B, E, and H), contains the same signature line.

17. As noted, supra n. 11, the Court will consider only the correspondence submitted to the Court.

18. The Court has not found any indication that this authority was delegated to the Chiefs of Civil Trial Sections, allowing those individuals to enter into settlements beyond those authorized by Directive 105.

Under Section 2 of Directive 105, Pt. O, Subpt. Y., App., the Chiefs of the Civil Trial Sections are authorized, subject to the conditions and limitations set forth in Section 8 thereof,[19] to:

(A) Accept offers in compromise in all civil cases, other than:

(*l*) Cases involving liability under Section 6672 of the Internal revenue Code; and

(ii) Cases in which judgments in favor of the United States have been entered, in which the amount of the Government's concession, exclusive of statutory interest, does not exceed $300,000;

(B) Approve administrative settlements of civil claims against the United States in all cases, other than cases involving liability under Section 6672 of the Internal Revenue Code, in which the amount of the Government's concession, exclusive of statutory interest, does not exceed $200,000;

(C) Approve concessions (other than by compromise) of civil claims asserted by the United States in all cases, other than cases involving liability under Section 6672 of the Internal Revenue Code, in which the gross amount of the original claim does not exceed $200,000;

(D) In civil cases involving liability under Section 6672 of the Internal Revenue Code, (i) accept offers in compromise in which the amount of the Government's concession, exclusive of statutory interest, does not exceed $500,000; (ii) approve administrative settlements of claims against the United States in which the amount of the Government's concession, exclusive of statutory interest, does not exceed $350,000; and (iii) approve concessions (other than by compromise) of claims asserted by the United States in which the gross amount of the original claim does not exceed $350,000;

(E) Accept offers in compromise of judgments in favor of the United States in all civil cases in which the amount of the Government's concession, exclusive of statutory interest, does not exceed $500,000;

(F) Accept offers in compromise in injunction or declaratory judgment suits against the United States in which the principal amount of the related liability, if any, does not exceed $300,000; and

(G) Accept offers in compromise in all other nonmonetary cases....

19. That section provides:
The authority redelegated herein shall be subject to the following conditions and limitations:

(A) When, for any reason, the compromise, administrative settlement, or concession of a particular claim, as a practical matter, will control or adversely influence the disposition of other claims totaling more than the respective amounts designated in Sections 2, 3, 4, 5, 6, and 7 hereof, the case shall be forwarded for review at the appropriate level for the cumulative amount of the affected claims;

(B) When, because of the importance of a question of law or policy presented, the position taken by the agency or agencies or by the United States Attorney involved, or any other considerations, the person otherwise authorized herein to take final action is of the opinion that the proposed disposition should be reviewed at a higher level, the case shall be forwarded for such review;

(C) If the Department has previously submitted a case to the Joint Committee on Taxation leaving one or more issues unresolved, any subsequent compromise, administrative settlement, or concession in that case must be submitted to the Joint Committee, whether or not the overpayment exceeds the amount specified in Section 6405 of the Internal Revenue Code;

(D) Nothing in this Directive shall be construed as altering any provision of Subpart Y of Part O of Title 28 of the Code of Federal Regulations requiring the submission of certain cases to the Attorney General, the Associate Attorney General, or the Solicitor General.

(E) Authority to approve recommendations that the Government confess error or make administrative settlements in cases on appeal is excepted from the foregoing redelegations; and

(F) The Assistant Attorney General, at any time, may withdraw any authority delegated by this Directive as it relates to any particular case or category of cases, or to any part thereof.

28 C.F.R.Ch. 1, Pt. O, Subpt. Y, App., Dir. 105 § 2. The Chief of the Office of Review is authorized to:

(A) Accept offers in compromise of claims against the United States in all civil cases in which the amount of the Government's concession, exclusive of statutory interest, does not exceed $1,500,000;

(B) Accept offers in compromise of claims on behalf of the United States in all civil cases in which the difference between the gross amount of the original claim and the proposed settlement does not exceed $1,500,000 or 15 percent of the original claim, whichever is greater;

(C) Approve administrative settlements of civil claims against the United States in all cases in which the amount of the Government's concession, exclusive of statutory interest, does not exceed $1,000,000;

(D) Approve concessions (other than by compromise) of civil claims asserted by the United States in all cases in which the gross amount of the original claim does not exceed $1,000,000;

(E) Accept offers in compromise in all nonmonetary cases; and

(F) Reject offers in compromise or disapprove administrative settlements or concessions, regardless of amount, provided that such action is not opposed by the agency or agencies involved or the chief of the section to which the case is assigned, and provided further that the proposed compromise, administrative settlement, or concession is not subject

to reference to the Joint Committee on Taxation.

*Id.* § 5.

The United States asserts that the total outstanding amount of the Donahues' and Midwest's liabilities, exclusive of interest, is approximately $1,672,595 (Doc. # 36 at 2). The government argues that if it were to retain more than $200,000 of the pension plan assets in the settlement, then the difference between the gross amount of the United States' claim and the proposed settlement would be just under $1,500,000. That compromise amount, it argues, would be within the settlement authority of the Chief of the Office of Review, but outside the authority of Mr. Mullarkey, the Chief of Civil Trial Section, Northern Region.

■ Assuming that the correspondence of October 2, 1998, represents the terms of the alleged settlement agreement, and that the difference between the gross amount of the United States' claim and the proposed settlement is just under $1,500,-000, as the government suggests (and Plaintiff does not dispute),[20] Mr. Mullarkey did not have the actual authority to settle the dispute between the United States, Midwest Pension Plan, Midwest, and the Donahues. At most, his authority to settle cases is limited to those where the amount of the Government's concession, exclusive of statutory interest, does not exceed $500,000. The instant litigation involves sums well beyond that authority. Although the correspondence signed by Mr. Mullarkey suggests that he was acting under the apparent authority of Ms. Argrett, a representation of apparent authority is insufficient to bind the United States. *See*

**20.** This representation appears to exclude the amount that the Donahues would be required to pay, in accordance with the settlement. Under the alleged terms of the agreement, the Donahues would be required to enter into a collateral agreement, whereby they would be required to make 60 monthly payments (Doc. # 29, Ex. H). These payments would consist of the excess of the Donahues monthly income over the monthly expenses allowed by the IRS. At present, the Court lacks evidence

regarding the value of those payments, and it is, consequently, unable to ascertain the actual amount to be compromised by the United States in reaching the alleged global settlement. However, because the parties do not dispute that the amount compromised was just under $1,500,000, for the purpose of resolving Plaintiff's Motion to Enforce Settlement, the Court will accept that representation as accurate.

*Utah Power & Light,* 243 U.S. at 409, 37 S.Ct. 387. Rather, the settlement authority must be within Mr. Mullarkey's actual authority. *Id.* In addition, although the signature line of the correspondence stated that the letter was "from" Ms. Argrett, there is no evidence to suggest that the settlement was negotiated by her. Thus, the Court does not consider the correspondence to indicate that Ms. Argrett, who had the authority to enter into the alleged settlement, ever exercised that authority. Accordingly, no enforceable settlement was reached on October 2, 1998. Plaintiff's Motion to Enforce Settlement is OVERRULED.

For the foregoing reasons, Plaintiff's Motion to Join Additional Parties (Doc. # 34) and its Motion to Enforce Settlement Agreement (Doc. # 29) are OVERRULED.

Counsel listed below will take note that a telephone conference call will be had at 8:30 a.m., on Wednesday, September 22, 1999, to discuss the current status of this litigation. Specifically, the Court will inquire whether keeping the captioned cause in an active state is necessary, in light of the government's concession that the funds from Midwest Pension Plan's accounts do not belong to anyone but the pension plan.